[No. H029242. Sixth Dist. June 23, 2006.]

SAVE OUR CARMEL RIVER et al., Plaintiffs and Appellants, v. MONTEREY PENINSULA WATER MANAGEMENT DISTRICT et. al., Defendants and Respondents.
FOURSOME DEVELOPMENT COMPANY et al., Real Parties in Interest and Respondents.

COUNSEL

Law Offices of Michael W. Stamp and Michael W. Stamp for Plaintiffs and Appellants.

De Lay & Laredo, David C. Laredo; and Deborah Mall, City Attorney, for Defendants and Respondents.

Sanger & Olson, Charles R. Olson; Hubbard & Hubbard and Donald Hubbard for Real Parties in Interest and Respondents.

OPINION

**BAMATTRE-MANOUKIAN, J.**—Appellants Save Our Carmel River, Patricia Bernardi and the Open Monterey Project appeal from the denial of their petition for a writ of mandate to overturn decisions by the City of Monterey (City) and the Monterey Peninsula Water Management District (Water District) to approve a water credit transfer. The City had found the water credit transfer was exempt from the California Environmental Quality Act (CEQA)[1] under the categorical exemption for replacement or reconstruction of existing facilities contained in section 15302 of the CEQA Guidelines.[2] The Water District had also approved the transfer, based in part on the City's exemption determination, and further found that the water credit transfer complied with the Water District's rules and regulations governing such transfers.

---

[1] Public Resources Code section 21000 et seq. Further unspecified statutory references are to this code.

[2] These guidelines, which we will refer to simply as "Guidelines," are contained at California Code of Regulations, title 14, section 15000 et seq.

Appellants contend that the water credit transfer does not fall within the categorical exemption for replacement or reconstruction of existing structures or facilities. (Guidelines, § 15302.) They further contend that even if the categorical exemption were applicable, there was evidence that two of the exceptions contained in the Guidelines applied here to remove the project from exempt status. (Guidelines, § 15300.2, subds. (b), (c).) Finally, they contend that the Water District violated its own rules in approving the transfer.

We find that section 15302 of the Guidelines, which provides that the replacement of an existing structure or facility is exempt from CEQA review, does not apply to the water credit transfer here. We further find that the Water District's approval of the transfer was not supported by substantial evidence in the record, in part because it was based on the City's exemption determination as lead agency, but also because the record reflected that the Water District did not consider the possible cumulative impacts of the water credit transfer, as expressly required by its rules. We will therefore reverse the trial court's denial of the writ of mandate and direct that the court enter an order granting the writ of mandate.

## BACKGROUND

### I. *Water Issues on the Monterey Peninsula—A Historical Perspective*

The Monterey Peninsula Water Management District was created by the state Legislature in 1977, based on findings that integrated water management was necessary because of severe water shortages in the area. The mandate of the Water District is to conserve and augment existing water supplies and to prevent waste and unreasonable use of those supplies. (72 B West's Ann. Wat. Code-Appen. (1995 ed.) § 118-2.) Nearly 25 years later, this court wrote that "[i]t is well documented that water availability is a critical problem throughout Monterey County . . . ." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 108–109 [104 Cal.Rptr.2d 326].) We noted that a Monterey County ordinance passed in 1988 found that " 'the potential exists that Monterey County's allocation of water will be exhausted so as to pose an immediate threat to the public health, safety, or welfare.' " (*Ibid.*)

The California-American Water Company (Cal-Am) is the main water supplier on the Monterey Peninsula, serving approximately 90 percent of the water users throughout the Monterey Peninsula Water District. Cal-Am draws on two principal sources of water for its customers: the Carmel River Basin and aquifers in the Seaside Basin. The primary source of Cal-Am's water supply is the Carmel River, either via surface diversion or from a number of

wells situated along the lower Carmel River. In 1995, in response to complaints that Cal-Am was illegally taking water from the Carmel River, the State Water Resources Control Board (State Water Board) issued Order No. 95-10. Order No. 95-10 is generally considered to be the controlling factor in water allocation and water resource management on the Monterey Peninsula.

In Order No. 95-10 (Order 95-10), the State Water Board found that Cal-Am was diverting excess water from the Carmel River Basin "without a valid basis of right," causing environmental harm.[3] In a related decision, the State Water Board found that "[e]xisting diversions from the Carmel River have adversely affected the public trust resources in the river." Cal-Am was ordered by the state agency to significantly reduce its pumping from the Carmel River, to mitigate the adverse environmental effects of its excess usage, and to develop a new plan for obtaining water legally. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at pp. 108–109.)

In addition to the Carmel River Basin, Cal-Am also extracts water from pumping in the Seaside Groundwater Basin. Because State Water Board Order 95-10 required Cal-Am to limit its diversions from the Carmel River Basin, this necessitated that it maximize its production from the Seaside Basin. As a result of the increased reliance on production from these wells, the aquifers in the Seaside Basin have not been able to fully recharge in recent years and are being depleted.

Under the Water District's water allocation program, the Water District allocates shares of Cal-Am's total annual water supply among its eight member jurisdictions, including the City of Monterey. Each jurisdiction manages its water allocation. Permits for new or intensified use of water require Water District approval. When a jurisdiction assigns all of its allocated water for new projects within the jurisdiction, it is "out of water" and cannot issue any further permits that require new water use. The Water District rules[4] provide that each new or expanded water use shall be "strictly accounted for." (District Rule 32-B.) An environmental impact report (EIR) prepared for the Water District's allocation program mandated that the Water District institute a 15 percent water conservation program.

---

[3] Approximately 75 percent of Cal-Am's average annual diversions from the Carmel River were found to be illegal. However, in recognition of the health impacts of such a drastic cutback of water to the Monterey Peninsula, the State Water Board set the goal of achieving a 20 percent reduction of Cal-Am's historical use until a replacement supply for the unlawfully diverted amounts could be developed.

[4] Rules and Regulations of the Monterey Peninsula Water Management District. We will be referring to these as the Rules or the District Rules.

## A. *The Water Use Credit Program—District Rule 25.5*

As part of its oversight of water allocation and distribution, the Water District established a program whereby a water customer may obtain and reuse water credits when water use on a particular property is reduced or discontinued. This program is described in District Rule 25.5. A reduction of water use, whether by changing to a less intensive use, by retrofitting equipment with water conserving devices, or by abandoning or demolishing a building, results in a water credit that may be used later on the same site.

The property owner applies to the Water District for the water credit and the Water District calculates the amount of the credit based upon the number and types of water-using fixtures that will be discontinued. A 15 percent reduction is figured into the credit, to be reserved by the Water District pursuant to its mandated conservation program. (See District Rule 25.5-A.1.) Thus the credit received by the water customer is only 85 percent of the reduction in capacity.

Under Rule 25.5-A.1, a documented water credit obtained from the Water District "may be applied to, and shall allow future water use on that Site at any time within a period of 60 months." The owner may apply for one extension of the 60-month period. However, after this time, "any remaining unused Water Use Credit shall expire." There are no provisions for further extensions.

## B. *The Water Credit Transfer Program—District Rule 28-B*

In 1993, the Water District began the Water Credit Transfer Program as a means to facilitate commercial expansion in the community while also supporting the Water District's conservation goals. Under the Water Credit Transfer Program, transfers of documented water credits (for commercial and industrial property only) are allowed from an existing commercial use to an expanding commercial use in the same jurisdiction. In 1995, a provision was added to the rule authorizing a transfer from a commercial use to a jurisdiction's water allocation. Water credit transfers must be approved by the Water District Board of Directors (Board), with prior approval of the jurisdiction in which the property is located.

In a property-to-property water credit transfer, the credit may only be used for water use intensification purposes, "as proposed by a current application for a water permit." (Rule 28-B.7.) Transferred credits "shall not be 'banked' for future use at any new or different site." (Rule 28-B.7.) In a property-to-jurisdiction water credit transfer, the future use of the credits "shall be at the discretion of the jurisdiction." (Rule 28-B.8.) The effect of

any water credit transfer is "the irrevocable extinction of any right or entitlement to the actual water use, water use capacity, or water credit which has been transferred from the originating (transferring) site." (Rule 28-B.15.)

Because any water credit is subject to a 15 percent reduction and reservation by the Water District pursuant to Rule 25.5, only 85 percent of the water use capacity is actually transferred in a water credit transfer. Thus a "key assumption" of the water credit transfer program is that "transfers will result in net reduced water use."

In 2000, in order to test this assumption, the Water District ordered a report to determine whether or not water demand had actually been reduced as a result of the water credit programs. The preliminary report indicated that the anticipated water savings from the water credit transfer program were not occurring. There were concerns that commercial water use factors did not accurately reflect actual historic water use at the transferring site. A final study completed in 2001 was "inconclusive" due to the lack of sufficient verifiable data. The data that was collected showed an increase in acre-feet of water actually used as a result of the water credit transfer program, rather than a decrease.

In 2002, the Water District determined that "the water transfer program had not resulted in the anticipated savings that had originally motivated the program and, in some cases, may have resulted in an increase in water usage." The water credit transfer program was discontinued, but was then reinstated the following year, in 2003, in response to a lawsuit by some of the Water District's jurisdictions. In reinstating the program, the Water District clarified that approval of a water credit transfer application is a discretionary act by the Board that requires environmental review. This language was added to District Rule 28-B.1: "Due to the District's ongoing concern about the viability of the available water supply and the possibility that water transfers may result in additional water usage, water transfers shall be approved by the Board of Directors, subject to the other provisions of this Rule, if the transfer will not have an adverse impact on the water supply. In exercising its discretion, the Board of Directors shall consider the impacts of the application under consideration, as well as the cumulative impacts of other transfers, on the water supply."

In enacting the 2003 ordinances that reinstated the Water Credit Transfer Program with an additional requirement for individual environmental assessment, the Water District Board indicated an intent to prepare an EIR to address concerns about the program in general, including whether it was accomplishing its water savings goals or whether it was, according to a staff

report, "exacerbating current environmental damage to local water resources." However, the Board later voted not to proceed with an EIR.[5]

A staff report in July of 2004 reflected ongoing concerns about the water credit transfer program. Staff noted that since the program had been initiated in 1993, circumstances had changed regarding water issues on the Monterey Peninsula. First and foremost, the State Water Board's Order 95-10 had severely limited the water supply within the Water District and had mandated a comprehensive water conservation plan in the region. In letters from the State Water Board to the Water District clarifying Order 95-10, the State Board had indicated that the water credit transfer program might violate both the letter and spirit of Order 95-10. Although the amount of water usage that had been transferred thus far pursuant to the water credit transfer program was relatively small (26 transfers totaling 60.843 acre-feet) in relation to Cal-Am's total water production supply, District staff wrote that "there is the potential for increased utilization of the program, particularly as water supplies are less available in the local jurisdictions and transfers provide one of the only ways to obtain a water permit for expanded uses."

Before turning to the water credit transfer in this case, it will be useful to have in mind the applicable requirements of CEQA and the CEQA Guidelines.

## II. *CEQA Overview*

"CEQA embodies our state's policy that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1100 [19 Cal.Rptr.3d 469]; § 21001, subd. (d).) As this court has observed, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage. [Citation.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at p. 117.) Consistent with this strong environmental policy, the CEQA statutes and the Guidelines issued by the California Resources Agency to implement CEQA "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612].)

---

[5] No EIR had been prepared when the program was first put into effect in 1993.

 "The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112.) CEQA applies if the activity is a "project" under the statutory definition, unless the project is exempt. If the agency finds the project is exempt from CEQA under any of the exemptions expressly set forth in the statute and in the Guidelines, no further environmental review is necessary. If no exemption applies, the agency proceeds to the second tier and conducts an initial study in order to determine "if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).) If the initial study shows that there is "no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency prepares a negative declaration so stating. (Guidelines, § 15063, subd. (b)(2); *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390 [83 Cal.Rptr.2d 836].) If the project does not qualify for a negative declaration, the agency must proceed to the third step in the process, full environmental review in an EIR. (Guidelines, §§ 15063, subd. (b)(1), 15080; *Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113; §§ 21100, 21151.)

The case before us concerns only the first step of the process, namely the determination that the project was categorically exempt from CEQA.

A. *Categorical Exemptions*

 The Legislature has authorized the Secretary of the Resources Agency to adopt a list of classes of projects determined to be exempt from CEQA because they "do not have a significant effect on the environment." (§ 21084.) Such classes of projects are "declared to be categorically exempt from the requirement for the preparation of environmental documents." (Guidelines, § 15300.) The determination whether a project is exempt under one of these classes is made as part of the preliminary review process prior to any formal environmental evaluation of the project. (*City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 820 [17 Cal.Rptr.2d 766], disapproved on another point in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) If the agency determines one of the exemptions applies, the agency may prepare and file a notice of exemption, including a description of the project, a finding that the project is exempt under the relevant class or classes, and a brief statement of reasons supporting the finding. (Guidelines, § 15062, subd. (a).) "Where a project is categorically exempt, it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 726 [3 Cal.Rptr.2d 488].)

The Secretary of the Resources Agency has identified 33 classes of projects as exempt. These appear in the Guidelines at sections 15301 through 15333. The class at issue in this case is "Class 2," described in Guidelines section 15302 as "replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced, . . ."

B. *Exceptions to Exempt Status*

The categorical exemptions are not absolute. Even if a project falls within the description of one of the exempt classes, it may nonetheless have a significant effect on the environment based on factors such as location, cumulative impact, or unusual circumstances. "[W]here there is any reasonable possibility that a project or activity may have a significant effect on the environment, an exemption would be improper." (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205–206 [132 Cal.Rptr. 377, 553 P.2d 537].) Guidelines section 15300.2 was adopted in recognition of this rule. It sets forth several exceptions to the categorical exemptions.

Subdivision (b) provides that "[a]ll exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant." (Guidelines, § 15300.2, subd. (b).) Subdivision (c) provides that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).)

A determination by the agency that a project is categorically exempt constitutes an implied finding that none of the exceptions applies. (*Association for Protection etc. Values v. City of Ukiah, supra,* 2 Cal.App.4th at p. 731.)

III. *The Water Credit Transfer in This Case*

In November of 1994, a commercial building complex located on Foam Street in Monterey, totaling approximately 11,274 square feet, was demolished. The uses in the building complex included a plumbing shop, barber shop, bakery, massage parlor and antique store. Based on the number of fixtures on the property, the Water District calculated a water credit of 0.789 acre-feet. A coordinated commercial development was planned in phases for the entire block of properties where the Foam Street property is located. In the first phase, the property where the building was demolished was to be used as a parking lot. That has been its continuing use since 1994.

In October of 1999 the developer, Foursome Development Company (Foursome), applied to the Water District for a five-year extension of the water credit assigned to the Foam Street property, pursuant to District Rule 25.5-A.1. The Water District approved the extension and advised Foursome that the water credit would expire November 1, 2004.

On August 24, 2004, Foursome informed the City that it proposed either to create an addition to its office complex at 765 Wave Street or to design and develop a new structure on a vacant lot owned by it at 860 Wave Street. These locations were in the vicinity of the demolished building on the Foam Street property.[6] The letter asked the City to permit the transfer of the .789 acre-feet of water credit allocated to the Foam Street property to the City for approximately one year, "to be held in reserve" until the architectural plans were complete, and then to be retransferred for use at the new site. As the letter acknowledged, this procedure would effectively "eliminate the expiration date of November 1, 2004 as established by the Monterey Peninsula Water Management District."

On August 27, 2004, Foursome applied to the Water District for a property-to-jurisdiction water credit transfer from 784 Foam Street to the City of Monterey, pursuant to District Rule 28-B. The application noted that the water credit was due to expire on November 1, 2004. The water credit transfer was placed on the agenda of the Water District's board meeting on October 18, 2004.

On September 15, 2004, the Water District's water demand manager, Stephanie Pintar, wrote to the City regarding Foursome's application for a water credit transfer. Pintar emphasized that under District Rule 28-B.1, the Water District Board in approving a water credit transfer must find that the transfer "will not have an adverse impact on the water supply" and must also consider the impacts of the transfer, as well as the cumulative impacts of other transfers, on the water supply. Pintar asked to review the City's environmental analysis, and in particular the City's determination as to cumulative impacts relating to the transfer.

---

[6] The record is somewhat unclear about the address of the property where the building was demolished. The building was located on parcel No. 001-016-015, which apparently included addresses ranging from 762 to 798 Foam Street. The first water credit extension sought in 1999 referred to a credit for 738/790 Foam Street, as did Foursome's letter of August 24, 2004. The City's notice of exemption refers to the property location as 784 Foam Street. The water demand manager assigned to the project "clarifie[d]" at the board meeting that the water credit was tied to 784 and 790 Foam Street. Foursome refers to the "donor site" throughout its briefing on appeal as 738/790 Foam Street.

The City approved the water credit transfer from 784 Foam Street to the City of Monterey and issued a "Notice of Exemption" on September 27, 2004, finding the project to be categorically exempt from CEQA under the Class 2 exemption set forth in CEQA Guidelines section 15302, for replacement of an existing structure. The notice explained that the project was exempt as a Class 2 exemption because it involved a transfer of a water credit from a previously existing building to the City's water allocation, which the City stated it would retransfer back to the same site "with the understanding that the property owner will construct a similar-sized building to that which previously existed on the site."

On September 28, 2004, the City responded to the inquiry from Water Demand Manager Pintar. City Planner Richard Rerig explained that upon review he had determined that the water credit transfer could not have a significant effect on the environment. The letter notified the District that the City had found the water credit transfer to be exempt from CEQA and that the City had filed a Notice of Exemption.

The administrative record does not contain any further evidence of any environmental evaluation of the water credit transfer by the City. However, in a declaration later provided to the court, City Planner Rerig stated that it was his opinion that the water credit transfer "could not possibly have a significant effect on the environment." He determined there were no cumulative impacts from this water credit transfer because any new building on the site would be required to use 15 percent less water than the buildings that previously occupied the site, due to the mandatory 15 percent reduction of the credit under the Water District's conservation policy.

At the October 18, 2004 board meeting of the Water District, Water Demand Manager Pintar recommended that the water credit transfer be approved. Pintar noted that the Water District would retain 15 percent of the credit, resulting in a net transfer of .671 acre-feet. She concluded that the transfer met the requirements of District Rule 28-B. The staff report explained that the transfer would not result in cumulative impacts because the City had found it was categorically exempt from CEQA. The report acknowledged that this was the first water credit transfer application that the Water District Board had considered since the language had been added to Rule 28-B.1 mandating consideration of adverse impacts on the water supply, and expressly requiring the Board to consider the cumulative impacts of other transfers. In response to a question by a Board member regarding the cumulative impacts of transfers of other water credits due to expire, Pintar conceded she "did not look at similar properties with credits that would expire in the near term."

A representative of Foursome spoke at the Water District board meeting about a planned development on the entire block of properties, including the property entitled to a water credit. He asked the Board to allow the water credit transfer to the City so that the credit could "be held in abeyance" until plans for the development were finalized.

Appellants submitted a letter to the Board, objecting to the proposed water credit transfer on CEQA grounds, as well as on the basis that it violated the Water District's own rules. They contended that the water credit transfer did not fall within the Class 2 categorical exemption because it was not a replacement of an existing structure. Furthermore, there was evidence in the record showing environmental impacts from the water credit transfer, in the form of studies commissioned by the Water District indicating that the net result of water credit transfers was an increase in overall water demand. The letter noted that if the Board approved this transfer, it would be the first time the Board had ever allowed a credit to be transferred to a jurisdiction to be held for future use in order to avoid the 10-year mandatory expiration date. The letter referred to records showing numerous other on-site water credits that could be similarly "banked" by transferring them for a holding period to the City, in the event that the Board established a precedent with the Foursome transfer. The letter pointed out that the Water District rules expressly prohibited banking of water credits for future use. (Rule 28-B.7.) Furthermore, the Rules provided for no exception to the 10-year expiration date in Rule 25.5.

The Board voted to approve the water credit transfer by a vote of 4 to 2. The dissenters expressed concerns about the CEQA exemption and about compliance with District Rule 28-B, particularly the lack of any cumulative impact analysis.

Appellants filed their petition for a writ of mandate on October 25, 2004, contending that the Water District and the City had violated CEQA in approving the water credit transfer based on the Class 2 exemption without any environmental review, and that the Water District in addition had violated its own rules. Appellants asked the court to set aside the approvals of the project. Foursome and Cal-Am participated as real parties in interest.

The court denied the writ petition. The court found that substantial evidence supported the determination that the Class 2 exemption in Guidelines section 15302 applied. The court reasoned that because the credit would not be used for any new or additional structure that was not based on historic use, it fell within the class of exemptions for replacement or reconstruction of existing structures. The court found that no exceptions applied. Acknowledging that studies done by the Water District appeared to show that the water

credit transfer programs did not generally result in any actual water savings, the court found that this did not constitute substantial evidence showing a possibility of an adverse environmental impact because "the current use will be substantially the same as the historical use associated with the site." The court further found that substantial evidence did not support a finding that there would be cumulative impacts from successive projects of this same type. The court relied on evidence that there was a 15 percent reduction figured into the water credit, and that only 26 transfers had been approved by the Water District since the program had been initiated in 1993. Finally, the court found that the requirements of Rule 28-B were satisfied by the Water District's finding that this was not a complex transfer involving multiple sites and therefore did not result in any cumulative impact.

## ANALYSIS

### I. *Standards of Review*

As always, we start with the standards that will guide our review.

### A. *The City's Action*

The City's determination that the project was exempt from compliance with CEQA requirements was a quasi-legislative action, where no administrative hearing was held or required. A preliminary determination such as this is subject to judicial review under the abuse of discretion standard in Public Resources Code section 21168.5. (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636 [10 Cal.Rptr.3d 560]; *Association for Protection etc. Values v. City of Ukiah, supra,* 2 Cal.App.4th 720.) Our inquiry focuses on "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.)

Where the issue turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents "a question of law, subject to de novo review by this court." (*Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251 [89 Cal.Rptr.2d 233]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192 [61 Cal.Rptr.2d 447].) Our task is "to determine whether, as a matter of law, the [project] met the definition of a categorically exempt project." (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792 [124 Cal.Rptr.2d 731], italics omitted.) Thus as to the question whether the activity comes within the categorical class of exemptions, "we apply a de novo standard of review, not

a substantial evidence standard." (*Ibid.*; see also *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 573.)

Where the record contains evidence bearing on the question whether the project qualifies for the exemption, such as reports or other information submitted in connection with the project, and the agency makes factual determinations as to whether the project fits within an exemption category, we determine whether the record contains substantial evidence to support the agency's decision. (*Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1173 [109 Cal.Rptr.2d 504]; *Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1252; *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 842 [171 Cal.Rptr. 753].) There must be " 'substantial evidence that the [activity is] within the exempt category of projects.' [Citation.]" (*Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 475 [129 Cal.Rptr.2d 344].) Generally speaking, the court "may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence within the meaning of Public Resources Code section 21168.5." (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 573.)

An agency's determination that the project falls within a categorical exemption includes an implied finding that none of the exceptions identified in the Guidelines is applicable. The burden then shifts to the challenging party to produce evidence showing that one of the exceptions applies to take the project out of the exempt category. (*Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 795; *City of Pasadena v. State of California, supra,* 14 Cal.App.4th at pp. 824–825, disapproved on another point in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th 559.) The question whether an exception applies is a question of fact, which is subject on appeal to review for substantial evidence. (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at pp. 1259–1260.) Some courts apply the "fair argument" test, holding that an exemption cannot stand if the challengers present a fair argument that an exception applies. (*Id.* at p. 1259.) Other courts apply an ordinary substantial evidence test. (*Id.* at pp. 1259–1260.)

### B. *The Water District's Action*

In reviewing the Water District's approval of the water credit transfer, where a public hearing was held and an adjudicatory decision was made, we apply the test for administrative mandamus. (Code Civ. Proc., § 1094.5.) "Section 1094.5 clearly contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision. . . .

[W]hen petitioned for a writ of mandamus, a court's inquiry should extend, among other issues, to whether 'there was any prejudicial abuse of discretion.' Subdivision (b) [of section 1094.5] then defines 'abuse of discretion' to include instances in which the administrative order or decision 'is not supported by the findings, *or* the findings are not supported by the evidence.' (Italics added.) Subdivision (c) declares that '*in all . . . cases*' (italics added) other than those in which the reviewing court is authorized by law to judge the evidence independently, 'abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.' [Citation.]" (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 [113 Cal.Rptr. 836, 522 P.2d 12], fn. omitted; *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 923 [8 Cal.Rptr.3d 178].)

## II. *Does the Class 2 Exemption Apply to This Project?*

In order to answer this question, we must first address the threshold issue, as to which the parties disagree, namely what is "the project" in this case?

### A. *What Is the "Project"?*

■ A "project" under CEQA is a discretionary activity by a public agency that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (§ 21065, subd. (a).) It includes agency approval of "a lease, permit, license, certificate, or other entitlement." (§ 21065, subd. (c).)

Appellants contend that the project in this case is the transfer of the water use credit from the Foam Street property to the City of Monterey. Foursome argues that this is too narrow a definition of the project. Foursome points out that under the Guidelines definition, a "project" is "the whole of an action." (Guidelines, § 15378, subd. (a).) In Foursome's view, the whole project in this case is the replacement of the commercial structure that was demolished on the Foam Street property in 1994. Thus the water credit transfer must be evaluated in this context. The City essentially shares this point of view, arguing that the water credit transfer is simply one of the aspects of the replacement of the building on the Foam Street property, and that the Class 2 exemption applies to all aspects of the project.

■ Although the Guidelines define a project as "the whole of an action" (Guidelines, § 15378, subd. (a)), an agency action qualifies as a project if it is "necessary to the carrying out of some private project involving a physical change in the environment." (*Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 664 [124 Cal.Rptr. 635],

italics omitted.) Here it appears that the transfer of water credits was a necessary step in the eventual plan by Foursome to develop the block of properties that included 784 Foam Street. Furthermore, the water credit transfer was also an activity unto itself, as it was the approval of an "entitlement" to future water rights. (§ 21065, subd. (c).)

Foursome contends that the water credit transfer by itself could not possibly cause any direct or indirect change to the environment. As appellants point out, however, courts have considered water credit transfers to have environmental impact. (See, e.g., *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at pp. 129–131.) Furthermore, the record in this case reflects that the State Water Board considered water credit transfers to have an effect on the water supply. And the Water District has expressly stated its "concern about the viability of the available water supply and the possibility that water transfers may result in additional water usage, . . ." (District Rule 28-B.) Thus the Water District, which supervises and manages water distribution in the area, views a water credit transfer to be an activity with possible environmental consequences, and its Board is required in approving a transfer to consider whether it would have "an adverse impact on the water supply." In this case, if the water credit were not transferred to the City, it would expire under Rule 25.5. Thus the transfer of the credit, to be held for future development of the property, results in an increment of water that will be used rather than conserved. Thus the City's action can be seen as causing a "reasonably foreseeable indirect physical change in the environment." (§ 21065, subd. (a).)

For all of these reasons, and bearing in mind that " 'project' is given a broad interpretation in order to maximize protection of the environment" (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439], disapproved on another point in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th 559), we conclude that the water credit transfer in this case was a "project" within the meaning of CEQA. This conclusion is fully supported by the record. Foursome applied here only for a transfer of water credits and the only action taken by the City was to approve the water credit transfer. Furthermore, the City's Notice of Exemption described the "Project" as a "Transfer of commercial water credit from 784 Foam Street to the City of Monterey." Similarly, the "Project Title" on the Notice of Exemption was "Water credit transfer from 784 Foam Street to City of Monterey." And the Water District staff report identified the project as a "Commercial-to-jurisdiction Water Use Credit Transfer."

B. *Was the Project Categorically Exempt Under Guideline Section 15032?*

■ The Guidelines provide that certain classes of projects "have been determined not to have a significant effect on the environment." (Guidelines, § 15300.) Since a determination that a project falls within a categorical exemption excuses any further compliance with CEQA whatsoever, we must construe the exemptions narrowly in order to afford the fullest possible environmental protection. (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster, supra,* 52 Cal.App.4th at p. 1193; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 966 [91 Cal.Rptr.2d 66]; *Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 842.) "[E]xemption categories are not to be expanded or broadened beyond the reasonable scope of their statutory language." (*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 842; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 125 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) These rules ensure that in all but the clearest cases of categorical exemptions, a project will be subject to some level of environmental review.

■ The Class 2 exemption at issue here consists of "replacement or reconstruction of existing structures and facilities where the new structure will be located on the same site as the structure replaced and will have substantially the same purpose and capacity as the structure replaced . . .." (Guidelines, § 15302.) Subdivision (b) of this Guideline provides that it applies specifically to "[r]eplacement of a commercial structure with a new structure of substantially the same size, purpose, and capacity." (Guidelines, § 15302, subd. (b).) On its face, this exemption does not apply to a water credit transfer, which is neither a structure nor a facility and therefore does not fit the elements of this exemption.

The City contends that the exemption applies for the reasons stated on its Notice of Exemption: "The project will transfer a documented water credit from a previously-existing building at 784 Foam Street to the City's water allocation. The City will then commit the water credit back to the same site with the understanding that the property owner will construct a similar-sized building to that which previously existed on the site."

Even if we were to consider the water credit transfer at issue here as part of an ongoing project to replace an existing structure, the City's determination that the requirements of the Class 2 exemption were met must be supported by substantial evidence in the record. (*Magan v. County of Kings,*

*supra,* 105 Cal.App.4th at p. 475.) In our view, the City's "understanding" that there will be a replacement structure of similar size and purpose on the same site does not amount to substantial evidence within the meaning of CEQA. The Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion . . . ." Substantial evidence does not include "[a]rgument, speculation, unsubstantiated opinion or narrative . . . ." (Guidelines, § 15384, subd. (a).) In the record before us, there is no "information" from which the City could conclude that the contemplated building meets the elements of the Class 2 exemption, in that it is a replacement structure "located on the same site" as the former structure and that it will have "substantially the same purpose and capacity" as the replaced structure. (Guidelines, § 15302.)

■ There were no plans, reports or proposals submitted with the application for a water credit transfer that showed a replacement structure to be built on the Foam Street property where the commercial complex was demolished in 1994. The only application to the City consisted of Foursome's letter of August 24, 2004, which stated that Foursome proposed to build either an "addition" to an office complex or a "new structure," the purpose of which was not described. Both of these were to be located on sites other than the Foam Street property at issue here. As we have noted, categorical exemptions must be carefully applied and supported by the evidence. (*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 842.) At the very least a Class 2 exemption determination must be based on evidence from which the agency can compare the replacement structure and the existing structure. Foursome's application letter does not provide this evidence.

We have found no cases applying a Class 2 exemption that have extended its application beyond the reasonable scope of its plain language. The typical application involves an agency's consideration of plans for reconstruction or replacement of an existing structure. For example, in *Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d 827, the applicant submitted plans and proposals to modernize its cement plant. The evidence in the record showed that the new plant would be in the same location as the existing facility, that the new facilities would not extend outside the area bounded by the present facility, that the purpose of the new facility would be the same, and that it would have substantially the same production capacity. (*Id.* at p. 829.) On review of the agency's determination that the project was exempt, the court was thus able to evaluate whether the elements of the Class 2 exemption were met and it found that they were. In the case before us, there is no similar factual predicate for the City's determination of a Class 2 exemption. There is only the City's "understanding" that a new structure will eventually be built that qualifies for the exemption.

Foursome contends that the City was in possession of plans for the replacement structure, and refers us to several documents contained in City's files.[7] These documents show that in 1991 Foursome's predecessor company wrote a letter to the City, requesting an amendment to a 1989 use permit to allow use as a parking lot of property at 738 and 790 Foam Street and 799 Wave Street. This was to be a first phase for future development of the property. Use permits issued in 1992 and extended in 1993 refer to a phase one parking lot and a phase two parking structure and a 17,972-square-foot commercial building to be constructed on property at 738 and 790 Foam Street and 799 Wave Street. The use permits provide that they expire on March 9, 1994. No site plans are included in the record before us and no further documentation appears until Foursome's letter to the Water District in 1999, requesting a five-year extension of the water credit at issue here.

The building that was demolished in 1994, for which the credit was issued, was 11,274 square feet. Its uses included retail shops, a bakery and a massage parlor. The project referred to in the 1992 use permit, which has apparently expired, consists of a parking structure and a 17,972-square-foot commercial building of indeterminate use, to be located on several sites that may include the site where the building was demolished. The 2004 application for a water credit transfer refers to two different buildings on entirely different sites. In order to support a Class 2 exemption, there must be substantial evidence that the activity meets the requirements of the exempt category. (*Magan v. County of Kings, supra,* 105 Cal.App.4th at p. 475.) In other words, there must be evidence from which it can be concluded that a new structure will replace an existing structure "on the same site" with "substantially the same purpose and capacity." (Guidelines, § 15302.) The record before us, even including the prior proposals and permits for the property, does not contain such evidence.

Foursome contends that the declaration of City Planner Rerig, which was submitted to the trial court, provided substantial evidence supporting the City's conclusion that the project was exempt under Guidelines section 15302.[8] In *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at page 573, our Supreme Court made clear that the trial court in a mandamus proceeding "generally may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence within the meaning of the Public Resources Code section 21168.5."

---

[7] These documents were apparently added to the administrative record by Foursome after the record was initially certified by the City and the Water District.

[8] In this declaration Rerig states that he reviewed Foursome's proposal to transfer its water credit. He determined that the credit arose because Foursome demolished a commercial building many years prior. He further determined "that the transfer of that water use credit to the City of Monterey for subsequent reuse at Foursome's development site could not possibly have a significant effect on the environment." He therefore prepared a Notice of Exemption. Rerig's declaration does not refer to the exemption contained in Guidelines section 15302.

(*Id.* at p. 573.) Our review is likewise limited to the record before the City at the time of its decision. We therefore do not consider the declaration in evaluating whether substantial evidence supported the City's exemption determination.

■ Foursome, the City and the Water District all emphasize the small amount of the water credit at issue here, when viewed in the context of the water supply in the entire region. They argue that a water credit transfer of such a small amount cannot possibly have any significant effect on the environment. This argument does not bear on the Class 2 exemption determination. The size of the project in relation to the surrounding area is not an element of a Class 2 exemption. To the extent that the project's size is relevant to the cumulative impacts analysis, we will address this issue in that portion of the discussion.

Foursome argues in its briefing on appeal that there may be other CEQA exemptions that apply to the water credit transfer. Since these issues were not raised below, we do not address them here. The City's exemption determination was based only on Guidelines section 15302. We express no opinion as to whether any other categorical exemption or other CEQA exemption may apply or as to what level of environmental review may be appropriate for this project.

■ We find as a matter of law that the water credit transfer in this case does not fit the definition of a categorically exempt project under the Class 2 exemption defined in Guidelines section 15302. We further find that substantial evidence in the record does not support City's determination that the project met the requirements of a Class 2 replacement structure. "An agency abuses its discretion if there is no basis in the record for its determination that the project was exempt from CEQA." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 114.) We therefore conclude that the City's exemption determination constituted a prejudicial abuse of discretion. (§ 21168.5.)

III. *The Exceptions to Exempt Status*

Since we conclude that the water credit transfer did not come within the Class 2 categorical exemption, we need not reach the next step of the analysis, which focuses on the question whether any exceptions to the exemption apply. Furthermore, the evidence submitted by appellants to support the exceptions they contend applied here was not before the City

when it determined that this project was exempt. Such evidence was, however, before the Board of the Water District, when it held a hearing on Foursome's request for a water credit transfer. We will therefore discuss appellants' evidence in the context of the Water District decision.

IV. *The Water District Approval*

Under CEQA law, the City acted as the "lead agency" with the principal responsibility for approving the water credit transfer and preparing any environmental documents. (Guidelines, § 15367.) The Water District was the "responsible agency." (Guidelines, § 15381.) As the responsible agency, the Water District is entitled to rely on the lead agency's environmental documents in acting on whatever aspect of the project requires its approval. (§ 21080.1; Guidelines, § 15050, subd. (c).) The responsible agency typically has permitting authority or discretionary approval power over some aspect of the project for which a lead agency is primarily responsible. (§ 21069; Guidelines, §§ 15096, 15381; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 173–175 [217 Cal.Rptr. 893].) And the "responsible agency may refuse to approve a project in order to avoid direct or indirect environmental effects of that part of the project which the responsible agency would be called on to carry out or approve." (Guidelines, § 15042.)

Here the water credit transfer program was created by the Water District, which was responsible for ensuring that any water credit transfer complied with its Rules, namely Rule 25.5 and Rule 28-B. The Water District's approval of the project, although it was based in part on the City's environmental assessment, was a determination independent from that of the City and must be separately evaluated against the District Rules. As noted, our review of the Water District's action consists of a determination whether the Water District's findings supported its decision and whether substantial evidence supported the findings. (Code Civ. Proc., § 1094.5, subd. (b).)

Appellants first contend that in approving the water credit transfer the Water District made no findings that the transfer would not have "an adverse impact on the water supply," or that it had considered "the cumulative impacts of other transfers[] on the water supply" as required by Rule 28-B.1. We believe the District made sufficient findings. The findings of an administrative agency can be informal so long as they serve the purposes of enabling the parties to determine whether and on what basis to appeal and enabling a reviewing court to determine the basis for the decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at p. 517.) Findings may consist of adopting the recommendations in a staff report. (*McMillan v. American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175,

183–184 [131 Cal.Rptr. 462].) That is what happened here at the Water District Board meeting, where a motion to adopt the staff recommendations and approve the water transfer was passed.

The Water District staff report acknowledged that Rule 28-B required the Board to approve the transfer "if the transfer will not have an adverse impact on the water supply," and the same rule further called for "consideration of the impacts of the application under consideration, as well as the cumulative impact of other transfers, on the water supply." The water demand manager preparing the report found no adverse impact and also identified no "cumulative impact that could result from the proposed transfer." While these are sufficient findings to support the Board's decision, that does not end the inquiry. We must in addition determine whether the findings are supported by substantial evidence in light of the whole record. (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at pp. 514–515.)

Appellants contend that the evidence does not support the findings contained in the staff report and adopted by the Water District Board. The record supports this contention. The Water District staff report concluded that the water credit transfer would not have an adverse impact on the water supply based solely on the Class 2 exemption determination made by the City. The water demand manager referred to the Notice of Exemption issued by the City and to a letter from the City planner stating that the water credit transfer was "exempt from the provisions of [CEQA]." Since we have concluded that the water credit transfer did not meet the requirements for a Class 2 categorical exemption, the City's Class 2 exemption determination does not provide substantial evidence for the finding in the Water District staff report, and adopted by the Board, that the transfer would not have an adverse environmental impact.

As to the consideration of the possible cumulative impacts of the water credit transfer, the report concluded there were no cumulative impacts for three reasons: First, the City had impliedly found that there were no cumulative impacts by determining that the project came within a categorical exemption. Second, the City had committed the water credit to be transferred back to the same property for use by a replacement structure of a similar size and capacity as the structure that originally existed on the site. And finally, the transfer in question was a simple transfer involving only one property and was "not a complex transfer involving multiple originating sites or multiple receiving sites."

Because the City's Class 2 exemption determination cannot stand, the City's implied finding under Guidelines section 15300.2, subdivision (b), that the project would have no cumulative impacts, must also fail and cannot suffice

to provide substantial evidence to support the Water District's finding regarding cumulative impacts. The second and third reasons cited by the Water District staff relate to the specific water credit transfer at issue, and do not address "the cumulative impacts of other transfers," as required by Rule 28-B.1. As to this issue, Water Demand Manager Pintar, who prepared the report, was asked directly by a Board director whether her cumulative impacts analysis included consideration of other properties in similar situations where water credits were due to expire and thus could be transferred to the jurisdiction for holding purposes. Pintar answered: "I did not look at similar properties with credits that would expire in the near term." In their letter to the Board, appellants had argued that approval of a water credit transfer for the acknowledged purpose of tolling the mandatory 10-year expiration period in Rule 25.5 would establish a precedent for other properties in similar situations. Appellants submitted copies of records listing commercial properties with existing water credits, showing water credits totaling from 35 to 85 acre feet that could possibly be affected by the Board's decision. As is apparent from the water demand manager's response, this evidence was not considered or taken into account in her recommendation that the transfer be approved.

Foursome argues that the colloquy that took place at the Water District Board meeting reflects that the Board considered cumulative impacts, which was all that it was required to do under Rule 28-B.1. We disagree. The rule requires the Board to consider not only the proposed transfer but also the cumulative impacts of "other transfers" on the water supply. The discussion and the staff report indicate that evidence of other properties with water credits due to expire was not considered by staff in its report for the Board. As a Board director observed, "if we allow people to transfer an expiring water credit to the City for the City to hold in abeyance for them until such time as they are going to use it again, I mean it's basically an end run around Rule 25.5, and I think there are a number of properties that fall into the same pattern, and I am concerned that we don't have an adequate report from staff on the cumulative impacts of those . . . ." The Board had before it no assessment as to how many other properties were similarly situated and therefore it had no basis to evaluate the possible "cumulative impacts of other transfers."[9]

Respondents stress the small amount of the water credit transfer at issue here, contending that it could have no possible effect on the water supply. However, the purpose of the requirement that cumulative impacts be considered, in CEQA law as well as in the District Rules, is to ensure review of the effects of the project in context with other projects of the same type.

---

[9] Foursome's assertion that the Board was aware that "few water credits were near their 10-year expiration date" is not supported by the record.

Thus the Guidelines expressly provide that "[c]umulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Guidelines, § 15355, subd. (b).)

Respondents point out that since the water credit transfer program was instituted in 1993, only 26 transfers have been made, transferring a total of 60.843 acre-feet. They contend that this shows that even the cumulative effect of the transfer program is de minimus. We disagree, for several reasons. The cumulative impact analysis requires the Board to consider changes in the environment resulting from "the incremental impact of the project when added to other closely related past, present, and *reasonably foreseeable probable future projects*." (Guidelines, § 15355, subd. (b), italics added.) A consideration of only the past water credit transfers does not fulfill this requirement. This is particularly so since the record indicates that water credit transfers may be on the rise. A previous staff report had acknowledged "the potential for increased utilization of [water credit transfers], particularly as water supplies are less available . . . and transfers provide one of the only ways to obtain a water permit for expanded uses." Furthermore, the transfer at issue here was the first water credit transfer to be considered by the Board under the revised Rule 28-B, which added the requirement that the Board consider environmental impacts, and specifically cumulative impacts, when considering an application for a water credit transfer. And it was the first such transfer where the credit was to be held by the jurisdiction to be re-transferred to the development site in order to avoid the 10-year expiration date in Rule 25.5. Thus the precedential effect of the approval of this project has some bearing on the cumulative impact analysis.

Foursome and the Water District assert repeatedly that the water credit transfer at issue cannot possibly have any impact on water resources on the Monterey Peninsula because the State Water Board will count all water credit transfers towards the 11,285 acre-feet water diversion limit imposed by the state board on Cal-Am under Order 95-10. The record citations provided by Foursome and Water District do not support these assertions. The citations reference a staff report prepared for a Water District Board meeting in January of 2004. Staff noted that after the State Water Board issued Order 95-10, the Water District had sought to clarify certain aspects of the order. The executive staff of the State Water Board had responded with several letters. In two of these, the state agency staff had asserted that the water credit transfers may violate both the letter and the spirit of Order 95-10. The State Water Board staff "indicated that it would recommend action to reduce the 11,285 AF Cal-Am diversion limit to correspond with future water allocations associated with water credit transfers." The actual letters from the State Water Board are not included in our record. There is no evidence that

the State Water Board ever took action to require that water allocations associated with water credit transfers be counted as part of Cal-Am's water diversion limit.

Finally, respondents insist that the water credit transfer at issue here, even if considered with other water credit transfers, cannot have any cumulative impact or other impact because the Water District reserves 15 percent of the water credit and thus only 85 percent of the credit is transferred, resulting in a net water savings. The evidence in the record shows, however, that because of the method of calculating the water credit, the 15 percent reservation may not be representative of actual water savings. Two studies were ordered by the Water District, and based on these studies the Water District had determined in 2002 that "the water transfer program had not resulted in the anticipated savings that had originally motivated the program and, in some cases, may have resulted in an increase in water usage." Because of these studies, the Water District actually discontinued the program, and questioned whether it was "exacerbating current environmental damage to local water resources." When the program was reinstituted, the revised District Rule 28-B expressed the Water District's continued concern about "the possibility that water transfers may result in additional water usage."

In sum, based on our review of the record before us, we conclude that the Water District's finding of no cumulative impacts associated with the water credit transfer was not supported by substantial evidence. Although Rule 28-B.1 provided that the Board must consider "the cumulative impacts of other transfers," staff did not consider evidence of other potential transfers of water credits, particularly those that were facing the 10-year expiration date, and therefore the Board did not have the relevant evidence from which to make an informed decision. As we have noted, this was the first occasion for the Board to apply the new provision in Rule 28-B.1, which acknowledged the Board's "ongoing concern about the viability of the available water supply and the possibility that water transfers may result in additional water usage," and which provided that the Board must consider adverse impacts and specifically cumulative impacts of other transfers on the water supply. And it was the first transfer application to be considered by the Board where the water credit was to be held by the jurisdiction for later use, in order to avoid the 10-year expiration date in Rule 25.5.

We express no opinion as to the possible significance of the evidence of any cumulative impacts or as to whether the Board's consideration of such impacts might change the outcome here.

## DISPOSITION

The order denying a writ of mandate is reversed and the court is directed to issue an order granting the writ of mandate and ordering that the City of Monterey and the Monterey Peninsula Water Management District reverse their approvals of the water credit transfer in accordance with the opinions expressed herein. Appellants are awarded costs on appeal.

Premo, Acting P. J., and Duffy, J., concurred.

On July 21, 2006, the opinion was modified to read as printed above.