[No. H036310. Sixth Dist. Oct. 28, 2011.]

JENI L. PFEIFFER et al., Plaintiffs and Appellants, v.
CITY OF SUNNYVALE CITY COUNCIL, Defendant and Respondent;
PALO ALTO MEDICAL FOUNDATION, Real Party in Interest and
Respondent.

**COUNSEL**

Alexander T. Henson for Plaintiffs and Appellants.

Trainor Fairbrook, Robert K. Best, John D. Fairbrook and Arthur Bernard Mark III for Defendant and Respondent and for Real Party in Interest and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, Acting P. J.—**

## I. INTRODUCTION

This CEQA[1] case arises from a proposal to expand a medical campus in the City of Sunnyvale (City). The Palo Alto Medical Foundation (PAMF) proposed to demolish one existing medical office building, a parking lot, and

---

[1] California Environmental Quality Act, Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

three single-family residences, and replace them with a larger medical office building, a parking garage, and a storage and waste management area. After preparing an environmental impact report (EIR) concerning PAMF's proposed project and considering public comments, in June 2009 the City of Sunnyvale City Council (city council) certified the EIR and approved the project. Two neighboring homeowners, appellants Jeni L. Pfeiffer and Eleanor Hansen, challenged the City's certification of the EIR and approval of PAMF's project by filing a petition for writ of mandate in the trial court. The trial court denied the petition after rejecting their contentions that the EIR was inadequate and the proposed project was inconsistent with the City's general plan.

On appeal, Pfeiffer and Hansen (hereafter, appellants) contend that the trial court erred in denying their writ petition because (1) the PAMF project as approved is inconsistent with the City's general plan, since the three single-family residences to be demolished and replaced with a storage and waste management area are located on land that must be used exclusively for single-family detached homes; (2) the EIR's discussion of general plan conformity is inadequate; (3) the EIR used a legally incorrect traffic baseline for determining the project's traffic impacts; (4) the EIR is inadequate because it used a hypothetical background traffic noise level instead of existing traffic noise levels to determine traffic noise impacts; and (5) the EIR's discussion of traffic noise impacts is inadequate.

For reasons that we will explain, we find no merit in appellants' contentions and therefore we will affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *PAMF's Proposed Project*

PAMF's existing medical campus in the City of Sunnyvale includes a 14,373-square-foot medical office building, a 72,065-square-foot medical office building, a 16,195-square-foot office building, a 5,000-square-foot office building, a surface parking lot, and three single-family residences on Kenney Court. One of the residences is being used by PAMF as an office. The land uses surrounding the PAMF medical campus include single-family residential, commercial, retail, and a school.

PAMF sought approval from the City for an expansion of its medical campus. The expansion project proposed by PAMF involved the demolition of the existing 72,065-square-foot building, the three single-family residences on Kenney Court, and a surface parking lot. As initially proposed, the project's new construction included a 150,000-square-foot, three-story medical office building with two levels of underground parking, a four-level aboveground parking structure, and a 3,250-square-foot storage and waste management area. The existing 16,195-square-foot building and the existing 14,373-square-foot building would remain. Additionally, PAMF proposed rezoning the property where the buildings and the surface parking lot to be demolished were located from low-medium density residential with an office/planned development combining district to public facilities/planned development combining district.

### B. *The Environmental Impact Report*

The City issued a notice of preparation of an EIR for the PAMF project on October 22, 2008. A publicly noticed scoping meeting for the general public and public agencies was held on October 29, 2008. A draft EIR was circulated for public comment in January 2009 and provided to public agencies, adjacent property owners, and members of the public who had requested notice. The draft EIR includes a transportation impact analysis, an air quality study, a noise assessment, a tree survey, a geotechnical investigation, a stormwater drainage plan, a hazardous materials phase I and asbestos and lead investigation for Kenney Court, a sanitary sewer analysis, and an alternatives analysis.

A final EIR for the PAMF project was published in May 2009. The final EIR includes the draft EIR, the City's responses to all oral and written comments received on the draft EIR, text changes to the draft EIR, and a draft mitigation monitoring and reporting program. The final EIR also indicates that PAMF submitted revised plans that reduced the building originally proposed to be 150,000 square feet and 58 feet high to 120,000 square feet and 38 feet high with a 52-foot-high pavilion. The revised plans also reduced the proposed four-story parking garage to two stories.

### C. *The City's Approval of PAMF's Project*

On June 23, 2009, the city council adopted resolution No. 389-09, which certified that the EIR was completed in compliance with CEQA. The city council also approved the revised PAMF project on June 23, 2009. Relevant

to this appeal, the resolution states that the PAMF project is consistent with the City's general plan as to land use, transportation, and noise. The resolution further states that although significant environmental impacts have been identified, with respect to construction noise, operational noise, and intersection traffic, among other things, "the City Council finds that each significant impact identified in the EIR is acceptable because mitigation measures have been required in order to reduce each effect to the extent feasible." However, the city council did not approve PAMF's request for rezoning, instead approving the maintenance of the existing zoning designation of low-medium density residential with an office/planned development combining district.

### D. The Petition for Writ of Mandate

On July 27, 2009, appellants filed a petition for writ of mandate challenging the City's approval of the PAMF project.[2] Appellant Pfeiffer identified herself as "a resident and taxpayer in the City of Sunnyvale, living across the street from the site proposed for the new medical office buildings proposed to be built . . . ." The petition named the city council as respondent and PAMF as real party in interest, and asserted causes of action for CEQA violation, general plan inconsistency, and zoning violation.

In their memorandum of points and authorities filed in support of the petition, appellants contended that the PAMF project was inconsistent with the City's general plan. They also contended that the EIR was inadequate because it used a legally incorrect baseline for traffic and traffic noise, was inconsistent as to whether construction noise was an unavoidable impact, and the discussions of general plan consistency and solar interference were inadequate.

The City and PAMF filed a memorandum of points and authorities in opposition to the petition. They argued that appellants had failed to meet their burden to demonstrate that the City's determination that PAMF's project was consistent with the general plan was arbitrary and capricious. They also argued that appellants had not shown that the City abused its discretion in approving the EIR, since there was substantial evidence to show that the EIR had used an appropriate baseline for measuring the project's impact on traffic and traffic noise, the discussion of construction noise impact was not misleading, and the discussion of solar interference was adequate.

---

[2] The record reflects that a first amended petition for writ of mandate was filed on August 12, 2009. The amended petition was not included in the record on appeal.

Finally, the City and PAMF argued that the third and fourth causes of action for zoning violation must be dismissed because appellants had failed to present any evidence or argument to support those causes of action.[3]

### E. *The Trial Court's Order*

The trial court's order denying the petition for writ of mandate was filed on October 6, 2010.[4] The court concluded that none of appellants' contentions had merit, finding that (1) the City's determination that the PAMF project was consistent with several goals of the general plan was reasonable; (2) the EIR's use of multiple traffic baselines to analyze traffic impacts and traffic noise impacts was appropriate; (3) although the draft EIR mistakenly listed construction noise in one chart as an impact that could be reduced to below significance, overall the EIR properly identified construction noise as a significant impact that could not be mitigated to low significance; and (4) the City's response to a letter from appellants' counsel regarding the City's compliance with the solar protection ordinance was adequate. The third cause of action for zoning violation was deemed abandoned.

Appellants filed a notice of appeal from the trial court's order on November 24, 2010. An order denying a petition for writ of mandate under CEQA is treated as an appealable final judgment. (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 832 [29 Cal.Rptr.2d 492].)

## III. DISCUSSION

Appellants contend that the trial court erred in denying their petition for writ of mandate for several reasons: (1) the PAMF project as approved is inconsistent with the City's general plan, since the three Kenney Court single-family residences to be demolished and replaced with a storage and waste management area are located on land that must be used exclusively for single-family detached homes; (2) the EIR's discussion of general plan conformity is inadequate; (3) the EIR used a legally incorrect traffic baseline for determining the project's traffic impacts; (4) the EIR is inadequate because it used a hypothetical background traffic noise level instead of existing traffic noise levels to determine traffic noise impacts; and (5) the EIR's discussion of traffic noise impacts is inadequate.

---

[3] The petition for writ of mandate included in the record on appeal does not have a fourth cause of action for zoning violation.

[4] The record on appeal does not include a copy of the reporter's transcript for the September 24, 2010 hearing on the petition for writ of mandate.

We will begin our analysis with a brief overview of CEQA and its EIR requirement before addressing each issue and the applicable standard of review.

### A. *CEQA Overview*

█ " 'CEQA [(§ 21000 et seq.)] embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." ' [Citation.] As this court has observed, 'the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage. [Citation.]' [Citation.] Consistent with this strong environmental policy, the CEQA statutes and the Guidelines[5] issued by the California Resources Agency to implement CEQA 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.' [Citation.]" *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 687 [46 Cal.Rptr.3d 387] (*Save Our Carmel River*).)

The first tier of the CEQA process requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project. (Guidelines, §§ 15060, 15061; *Save Our Carmel River, supra,* 141 Cal.App.4th at p. 687.) "If the initial study shows that there is 'no substantial evidence that the project or any of its aspects may cause a significant effect on the environment,' the agency prepares a negative declaration so stating. [Citations.] If the project does not qualify for a negative declaration, the agency must proceed to the third step in the process, full environmental review in an EIR." (*Save Our Carmel River, supra,* 141 Cal.App.4th at p. 688.)

█ Thus, under CEQA, a public agency must prepare an EIR only with regard to "projects that may have significant environmental effects (§§ 21100, subd. (a), 21151, subd. (a))." (*Communities for a Better Environment, supra,* 48 Cal.4th at p. 315.) "The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that

---

[5] The regulations that guide the application of CEQA are set forth in title 14 of the California Code of Regulations, and are often referred to as the CEQA Guidelines. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4 [106 Cal.Rptr.3d 502, 226 P.3d 985] (*Communities for a Better Environment*).) The CEQA Guidelines are accorded " 'great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (48 Cal.4th at p. 319, fn. 4.) References to Guidelines hereafter are to the state CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.)

the public is assured that those consequences have been taken into account. [Citation.] For the EIR to serve these goals it must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449–450 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

■ Specifically, " '[t]he EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979 [99 Cal.Rptr.3d 572].) However, " ' "[t]echnical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure." ' [Citations.]" (*Ibid.*) "Nevertheless, given the key role of the EIR in carrying out CEQA's requirements, 'the integrity of the process is dependent on the adequacy of the EIR.' [Citation.]" (*Id.* at pp. 979–980.) The burden of showing that the EIR is inadequate is on the party challenging the EIR. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 [91 Cal.Rptr.3d 571].)

B. *Consistency with the General Plan*

Appellants contend that the city council abused its discretion in determining that the PAMF project's proposal to demolish three single-family residences on Kenney Court and replace them with a waste management and storage area is consistent with the City's general plan, since, in appellants' view, the general plan expressly provides that the Kenney Court property is to be used exclusively for single-family detached homes.

■ Our evaluation of appellants' contention is governed by well-established standards. Under the Government Code, every county and city is required to adopt " 'a comprehensive, long-term general plan for the physical development of the county or city . . . .' (Gov. Code, § 65300.) A general plan provides a ' "charter for future development" ' and sets forth a city or county's fundamental policy decisions about such development. [Citation.] These policies 'typically reflect a range of competing interests.' [Citation.] Nevertheless, a city's land use decisions must be consistent with the policies

expressed in the general plan. [Citation.] ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." [Citation.]' [Citation.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 815 [65 Cal.Rptr.3d 251] (*Friends of Lagoon Valley*).)

" ' "An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." [Citation.]' [Citation.] State law does not require perfect conformity between a proposed project and the applicable general plan . . . . [Citation.]" (*Friends of Lagoon Valley, supra*, 154 Cal.App.4th at p. 817.) In other words, "it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan. [Citations.]" (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510–1511 [19 Cal.Rptr.3d 1].)

This court addressed the applicable standard of review—abuse of discretion—in *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*). "When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Ibid.*)

We review the agency's decision regarding consistency with the general plan "directly and are not bound by the trial court's conclusions. [Citations.]" (*Friends of Lagoon Valley, supra*, 154 Cal.App.4th at p. 816.) "A city's findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]" (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648 [20 Cal.Rptr.2d 228].) Thus, the party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable. (*California Native Plant Society v. City of Rancho Cordova, supra*, 172 Cal.App.4th at p. 639.)

Here, as stated in the City's resolution No. 389-09, adopted June 23, 2009, the city council determined that the proposed PAMF project is consistent with the land use and transportation policies stated in the City's general plan. Relevant to this appeal, the city council specifically determined that (1) the project is consistent with the community character goal C1[6] because "the proposed redevelopment would be designed in accordance with the existing medical office buildings surrounding [the] site"; (2) the project is consistent with neighborhood goal N1[7] because "[t]he project proposes medical office uses on a site that is located near major roadways . . . and served by regional transit"; and (3) the project "proposes to redevelop existing medical office uses that are not reflected in the City's General Plan" and is consistent with the land use goal 2.1C, to "allow growth and change in the community which can be served within the capacities of existing and planned facilities."

We understand appellants to contend that the PAMF project is inconsistent with the City's general plan because the three single-family residences slated for demolition and replacement with a storage and waste management area are located in an area that the general plan designates as low density residential, which is a designation that, according to appellants, expressly excludes any use other than single-family detached homes.

PAMF and the City respond that appellants have waived their inconsistency argument by failing to set forth all of the evidence pertaining to the City's finding of consistency with the general plan. They also argue that the low density residential provision in the general plan on which appellants rely is taken out of context "and designed to manufacture an inconsistency without considering the General Plan as a whole." They further assert that appellants failed either to discuss the City's extensive findings regarding general plan consistency or to identify any goals, policies, and objectives of the general plan with which the PAMF project is inconsistent.

For several reasons, we determine that appellants have not met their burden to show that the city council abused its discretion in finding that the PAMF project is consistent with the City's general plan. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.)

First, we observe that appellants' inconsistency argument is based on appendix A to the general plan, "Relationship of General Plan Land Use

---

[6] In the City's general plan, community goal C1 states, "Preserve and enhance an attractive community, with a positive image and a sense of place, that consists of distinctive neighborhoods, pockets of interest, and human-scale development."

[7] In the City's general plan, neighborhood goal N1 states, "preserve and enhance the quality character of Sunnyvale's industrial, commercial and residential neighborhoods by promoting land use patterns and related transportation opportunities that are supportive of the neighborhood concept."

Categories with Zoning Categories," which states, "The low density residential sub-category allows 0-7 dwelling units per acre. It is used exclusively for single family detached homes and is implemented by the R-0 and R-1 Zoning Districts." The parties agree that the property where the three single-family residences to be demolished are located (420, 428, and 448 Kenney Court) is designated low density residential. However, the record reflects that the property is currently zoned low-medium density residential with an office/planned development combining district, R-2/0/PD. Appellants do not dispute that the city council decided to maintain the current zoning for the Kenney Court property, which is adjacent to the rest of the PAMF medical campus. Thus, the record does not reflect that the area where the Kenney Court houses are located has been used exclusively for single-family detached houses.

Second, appellants have not provided any authority for the proposition that a statement in an appendix to the general plan regarding the designation of low density residential constitutes a general plan mandate that property designated low density residential must be used exclusively for single-family detached houses. To the contrary, we believe that the low density residential designation in the general plan may be interpreted, at best, to limit land use exclusively to single-family detached houses only where the low density residential designation is, as stated in appendix A, "implemented by the R-0 and R-1 Zoning Districts." As we have discussed, the Kenney Court property was not zoned R-0 or R-1, but instead was zoned R-2/0/PD, low-medium density residential with an office/planned development combining district. Moreover, to the extent the PAMF project's replacement of three Kenney Court residences with a waste management and storage area is arguably not consistent with the low density residential designation, we reiterate that "[s]tate law does not require perfect conformity between a proposed project and the applicable general plan . . . . [Citation.]" (*Friends of Lagoon Valley, supra*, 154 Cal.App.4th at p. 817.)

Appellants have also failed to show that the city council did not consider " 'the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Save Our Peninsula, supra*, 87 Cal.App.4th at p. 142.) As we have noted, the city council determined, among other things, that the PAMF project was consistent with the City's general plan with respect to the plan's community character, neighborhood, and land use goals. Appellants make no showing that the city council's determination of consistency with respect to these general plan goals was unreasonable. Instead, appellants merely make the conclusory argument that the city council erred by not making any express findings regarding the Kenney Court property. We emphasize that appellants, as the parties challenging a city's determination of general plan consistency, have the burden to show why, based *on all of the evidence* in the record, the determination of general plan

consistency was unreasonable. (*California Native Plant Society v. City of Rancho Cordova, supra,* 172 Cal.App.4th at p. 639.) Since appellants did not discuss all of the evidence in the record pertinent to the issue of general plan consistency, appellants failed to meet their burden to show that the determination of general plan consistency was unreasonable.

For these reasons, we find no merit in appellants' claim that the city council abused its discretion in finding that the PAMF project is consistent with the City's general plan.

### C. Discussion of General Plan Conformity

According to appellants, the CEQA Guidelines (§ 15125, subd. (d)) require an EIR "to address the consistency of a project with the applicable general plan." In particular, appellants assert that "the EIR had a duty to fully present the issue of general plan consistency of that portion of the project being built on land designated in the City's general plan as exclusively residential with single family detached homes. It also had a duty to explain this issue in response to the comment received on the issue of general plan consistency."

■ The City and PAMF point out that CEQA requires only a discussion of general plan *inconsistency.* We agree. " '[W]hile there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan. [Citation.]' [Citation.] 'Because EIRs are required only to evaluate "any *inconsistencies*" with plans, no analysis should be required if the project is *consistent* with the relevant plans. [Citation.]' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 918–919 [98 Cal.Rptr.3d 137] (*City of Long Beach*).)

Further, the authorities cited by appellants, including section 21091, CEQA Guidelines section 15088, and *People v. County of Kern* (1974) 39 Cal.App.3d 830, 841–842 [115 Cal.Rptr. 67], do not support their argument that CEQA expressly requires a discussion of general plan consistency and responses to comments regarding general plan consistency.

Section 21091, subdivision (d) provides in pertinent part, "(1) The lead agency shall consider comments it receives on a draft environmental impact report, proposed negative declaration, or proposed mitigated negative declaration if those comments are received within the public review period. [¶] (2)(A) With respect to the consideration of comments received on a draft environmental impact report, the lead agency shall evaluate comments on environmental issues that are received from persons who have reviewed the draft and shall prepare a written response pursuant to subparagraph (B). The

lead agency may also respond to comments that are received after the close of the public review period. [¶] (B) The written response shall describe the disposition of each significant environmental issue that is raised by commenters. The responses shall be prepared consistent with Section 15088 of Title 14 of the California Code of Regulations, as those regulations existed on June 1, 1993." Section 21091 does not expressly state that the lead agency must respond to comments regarding general plan consistency.

The CEQA Guidelines similarly provide that "(a) The lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response. The lead agency shall respond to comments received during the noticed comment period and any extensions and may respond to late comments. [¶] (b) The lead agency shall provide a written proposed response to a public agency on comments made by that public agency at least 10 days prior to certifying an environmental impact report. [¶] (c) The written response shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular, the major environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice." (Guidelines, § 15088; see *City of Long Beach, supra,* 176 Cal.App.4th at p. 903.)

The appellate courts have noted that "[t]he requirement of a detailed written response to comments helps to ensure that the lead agency will fully consider the environmental consequences of a decision before it is made, that the decision is well informed and open to public scrutiny, and that public participation in the environmental review process is meaningful." (*City of Long Beach, supra,* 176 Cal.App.4th at p. 904; see *People v. County of Kern, supra,* 39 Cal.App.3d at pp. 841–842.)

In the present case, appellants state that the issue of general plan consistency "was spotlighted in public comment" and provide a page reference to the administrative record, without any description or discussion of the actual comment or any deficiencies in the EIR's response. To the extent appellants are contending that the EIR does not contain an adequate response to this public comment, we will address the issue.

Reviewing appellants' page reference to the administrative record (which is contained in the "Comments to the DEIR [(draft EIR)]" section), we understand appellants to be referring to the following public comment: "**Comment**

**33.5**: The other major intrusion to the neighborhood from this project is the conversion of residential property to serve this commercial use. This raises a number of issues principally concerning the integrity and legality of the City's General Plan. The citizenry can expect that for each and every category of land use depicted on the City of Sunnyvale General Plan, there will be statements of building intensity and population density pursuant to the requirements of the Public Resources Code Section 65302(a). That means it is unlikely that the General Plan designation 'Low Density Residential' includes a statement of how much office space can be allowed per acre. In the absence of such designations, the zoning ordinance was without authority to change the general plan designation to allow the office use on property designated 'Residential.' Thus, while the project description discusses changing the zoning, actually, the General Plan designation for the properties on Kenney Court needs to be changed to 'Office.' The EIR should address this issue of General Plan conformity and conformity of the General Plan with state law."

The draft EIR contains the following response: "**Response 33.5**: The existing zoning designation for the parcels on the project site is *R-2/0/PD Low-Medium Density Residential with a Office-Planned Development Combining District* (301 and 401 Old San Francisco Road and 420, 428, and 448 Kenney Court). The existing General Plan designations for the sites are: *Office* (301 and 401 parcel) and *Low Density Residential* (420, 428, and 448 parcel). The project is proposing a zoning designation change for the 301 and 401 Old San Francisco Road parcels, and the 420, 428, and 448 Kenney Court parcels from *R-2/0/PD Low-Medium Density Residential with a Office-Planned Development Combining District* to *PF-PD Public Facility/Planned Development*. The *PF/PD Public Facilities* zoning designation is intended for government, public utility, and education building facilities, and other uses compatible with the public character of the district. The proposed medical office building and parking uses for the proposed project can be considered in the *P-F/PD* zoning designation with a discretionary permit (SDP). [¶] The proposed *P-F/PD-Planned Development District* is compatible with the surrounding uses and is consistent with the existing General Plan designation of *Office* and *Low Density Residential*."

██ We find that this response to public comment 33.5 satisfies the requirements set forth in the CEQA Guidelines. (Guidelines, § 15088, subd. (c).) The response contains a similar level of detail as the comment and demonstrates a good faith analysis as to how the matter was addressed and analyzed. (*City of Long Beach, supra*, 176 Cal.App.4th at pp. 904–905.) Therefore, in addition to finding no merit in appellants' contention that the EIR is inadequate because it fails to address general plan conformity, we also find that the EIR provided a satisfactory response to a public comment on general plan conformity.

D. *Traffic Baseline*

Appellants contend that the EIR is inadequate because it used a legally incorrect traffic baseline for measuring the PAMF project's traffic impacts. According to appellants, the EIR improperly used hypothetical "background conditions" instead of existing conditions as the traffic baseline.

The standard of review for an agency's certification of an EIR under CEQA is well established. "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Vineyard, supra*, 40 Cal.4th at p. 427.)

However, "[i]n reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' ([§] 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard, supra*, 40 Cal.4th at pp. 426–427, fn. omitted.)

The CEQA Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. . . . Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).) Additionally, "[s]ubstantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subd. (b).)

Thus, "[t]he agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.] In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate. [Citations.]" (*Save Our Peninsula, supra*, 87 Cal.App.4th at p. 117.)

According to appellants, the CEQA Guidelines require the City to use a traffic baseline for measuring the PAMF project's traffic impacts that is based

solely on traffic conditions existing at or before the time of project approval. They contend that the draft EIR prepared by the City improperly analyzed traffic impacts by using hypothetical "background conditions" as the baseline.

The City and PAMF maintain that the traffic baseline used in the draft EIR is not legally incorrect, since CEQA does not mandate the use of a particular baseline and a baseline that deviates from existing conditions is allowed under the circumstances here. They also reject appellants' contention that the traffic baseline used is hypothetical, asserting that "the city's choice of baseline includes only reliable data that realistically describes traffic conditions that will exist in the area with the new medical office buildings."

Our resolution of the issue is guided by the California Supreme Court's recent decision in *Communities for a Better Environment*. In discussing the baseline that is appropriately used in an EIR to measure a project's environmental impacts, the court referred to the CEQA Guidelines: "Section 15125, subdivision (a) of the CEQA Guidelines provides: 'An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. *This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.*' [Citation.]" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 320, fn. omitted.)

The California Supreme Court also determined, however, that "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence. [Citation.]" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328.)

Quoting this court's decision in *Save Our Peninsula*, our Supreme Court further determined that "as one appellate court observed, 'the date for establishing baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' [Citation.] In some circumstances, peak impacts or recurring periods of resource scarcity may be as important environmentally as average conditions. Where environmental conditions are expected to change quickly during the period of environmental review for reasons other than the proposed project, project effects might reasonably be

compared to predicted conditions at the expected date of approval, rather than to conditions at the time analysis is begun. [Citation.]" (*Communities for a Better Environment, supra,* 48 Cal.4th at pp. 327–328.)

■ In *Save Our Peninsula,* this court addressed baseline traffic levels: "For instance, where the issue involves an impact on traffic levels, the EIR might necessarily take into account the normal increase in traffic over time. Since the environmental review process can take a number of years, traffic levels as of the time the project is approved may be a more accurate representation of the existing baseline against which to measure the impact of the project. [Citation.]" (*Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 125–126 [baseline for water use was not supported by the evidence].)

In the present case, the draft EIR for the proposed PAMF project includes an analysis of transportation impacts in "Section 2.0—Environmental Setting, Impacts, and Mitigation." To determine the project impacts on vehicle traffic, the analysis studied multiple intersections, roadway segments, and freeway segments in the vicinity of the proposed PAMF project. The study intersections were evaluated "for the four scenarios, including existing conditions, background conditions, project conditions, and cumulative conditions (year 2020)."

The draft EIR also included an explanation of the methodology used to determine the existing conditions, background conditions, project conditions, and cumulative conditions used in its traffic impacts analysis. Existing conditions for the study intersections were obtained in 2007 from traffic counts "representing peak one-hour traffic conditions during the morning and evening commute periods." Background conditions were "[e]xisting peak-hour volumes multiplied by a growth factor plus traffic from approved but not yet constructed developments in the area. The traffic growth factor was developed based on the City of Sunnyvale's travel demand forecasting model." Project conditions were "[b]ackground peak-hour traffic volumes plus traffic generated by the proposed project (a net increase of an additional 71,700 s.f. of medical office building space)." Cumulative conditions were "[e]xisting volumes multiplied by a growth factor plus traffic from approved but not yet constructed and pending developments in the area. The traffic growth factor was developed based on a comparison of the traffic projections for the General Plan, as well as, cumulative scenarios from the City of Sunnyvale's travel demand forecasting model and the *Moffett Park Specific Plan.*"

Additionally, appendix C to the draft EIR includes a "Draft Transportation Impact Analysis," dated December 2008, that set forth in detail the methodology used to determine the existing conditions, background conditions, project

conditions, and cumulative conditions, and also provides the raw traffic data collected. Using this raw data for existing conditions and the predictions for traffic conditions generated by factors other than the PAMF project, including already-approved developments, the draft EIR's traffic analysis concluded that the PAMF project would not result in "significant near-term impacts" to either freeway segment capacities or roadway segment capacities, and also would not result in any "significant intersection level of service impacts."

Having reviewed the draft EIR, we determine appellants have not met their burden to show that the EIR is legally inadequate with respect to the baseline used to measure traffic impacts. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117.) First, appellants' contention that a traffic baseline is limited to existing conditions lacks merit because, as we have discussed, the California Supreme Court has instructed that predicted conditions may serve as an adequate baseline where environmental conditions vary. " '[T]he date for establishing baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' [Citation.]" (*Communities for a Better Environment, supra,* 48 Cal.4th at pp. 327–328.) Here, there was substantial evidence, undisputed by appellants, that traffic conditions in the vicinity of the PAMF project could vary from existing conditions due to a forecast for traffic growth and the construction of already-approved developments. Moreover, appellants overlook the fact that the EIR included existing conditions, based on actual traffic counts, in its analysis of traffic impacts.

Second, appellants fail to show that the City's decision to certify the EIR was not based on substantial evidence with respect to the traffic impact analysis or the traffic baselines used in the analysis. " 'As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his [or her] burden. [Citation.]' [Citation.]" (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934–935 [99 Cal.Rptr.3d 621].) Here, appellants make no attempt to set forth the evidence supporting the EIR's traffic impact analysis or the baselines used in the analysis. For example, the traffic impact analysis includes charts comparing the traffic data for the existing conditions, the background conditions, and the cumulative conditions,[8] which present "information in such a manner that the foreseeable impacts of pursuing the project" may "actually be understood and weighed." (*Vineyard, supra,* 40 Cal.4th at pp. 449–450.) Appellants also make no argument as to why this evidence, or any other evidence provided as support for the EIR's traffic impact analysis,

---

[8] See, e.g., table 2.2-6, "Existing and Background Intersection Level of Service," and table 2.2-8, "Cumulative Intersection Level of Service."

is insufficient. Their conclusory argument that the traffic baseline is hypothetical is not adequate to meet their burden as the parties challenging the EIR.

This court's decision in *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351 [119 Cal.Rptr.3d 481] (*Sunnyvale West*), on which appellants rely, does not compel a different conclusion. The decision in *Sunnyvale West* involved a CEQA challenge to the city council's approval of the proposed Mary Avenue extension project. (*Sunnyvale West*, at p. 1358.) The trial court granted a peremptory writ of mandate setting aside the approval on the ground that the baseline used to measure traffic impacts was "projected traffic conditions in the year 2020," and the final EIR did not consider "the project's traffic and related impacts on the existing environment." (*Ibid.*) This court affirmed, finding that the city had erred in when it "chose the projected conditions in the year 2020, more than a decade after approval, as the 'baseline' against which to assess the traffic and related impacts of the proposed project." (*Id.* at p. 1379.) "Although '[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the *existing* conditions baseline' (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328, italics added) nothing in the law authorizes environmental impacts to be evaluated only against predicted conditions more than a decade after EIR certification and project approval." (*Id.* at p. 1380.)

■ *Sunnyvale West* is therefore distinguishable from the present case, where the traffic baselines included in the EIR were not limited to projected traffic conditions in the year 2020, but also included existing conditions and the traffic growth anticipated from approved but not yet constructed developments. Moreover, this court acknowledged in *Sunnyvale West* that future conditions may be considered in determining a proposed project's impacts on the environment. "This is not to say, however, that discussions of the foreseeable changes and expected future conditions have no place in an EIR. To the contrary, such discussions may be necessary to an intelligent understanding of a project's impacts over time and full compliance with CEQA." (*Sunnyvale West, supra*, 190 Cal.App.4th at p. 1381.)

This court further noted in *Sunnyvale West* that the CEQA Guidelines expressly provide for consideration of potential future conditions. "Although '[in] assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area . . . ,' the EIR must still clearly identify and describe the '[d]irect and indirect significant effects of the project on the environment' and give 'due consideration to both the short-term and long-term effects.' (CEQA Guidelines, § 15126.2, subd. (a).) Further, '[w]here a proposed project is compared with an adopted plan, the

[EIR's] analysis shall examine the *existing physical conditions* at the time the notice of preparation is published, or if no notice of preparation is published, at the time the environmental analysis is commenced *as well as the potential future conditions discussed in the plan.*' (CEQA Guidelines, § 15125, subd. (e), italics added.)" (*Sunnyvale West, supra*, 190 Cal.App.4th at p. 1381.)

Accordingly, we find no merit in appellants' contention that the EIR is inadequate because it used a legally incorrect traffic baseline for measuring the PAMF project's traffic impacts.

### E. *Traffic Noise Impacts*

Appellants contend that the EIR's discussion of traffic noise impacts is also inadequate due to the use of a hypothetical background traffic baseline and the failure to set forth the project's noise impacts on the existing environment.

The City and PAMF respond that the EIR utilized actual noise levels in assessing traffic noise impacts, and argue that appellants "have not explained why the record fails to support the City's conclusion that the traffic noise from the project will be a less than significant impact."

We again apply the abuse of discretion standard of review: "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' ([§] 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard, supra*, 40 Cal.4th at pp. 426–427, fn. omitted.)

We are also mindful that "[t]he agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. [Citation.] In reviewing an agency's decision to certify an EIR, we presume the correctness of the decision. The project opponents thus bear the burden of proving that the EIR is legally inadequate. [Citations.]" (*Save Our Peninsula, supra*, 87 Cal.App.4th at p. 117.)

Having reviewed the EIR, we agree with the City that appellants have not met their burden to show that the EIR is legally inadequate with respect to its discussion of traffic noise impacts. Although appellants claim that the EIR used a hypothetical background traffic baseline and failed to set forth the project noise impacts on the existing environment in its assessment of traffic noise impacts, the record does not support their claim.

In "Section 2.0—Environmental Setting, Impacts, and Mitigation," the draft EIR includes a section captioned "Noise Impacts from the Project." With regard to traffic noise, the EIR states, "Ambient daily average noise levels at the site range from 52 to 54 Dba L. According to the traffic analysis prepared for the project (refer to Appendix C), traffic noise level increases resulting from background plus project conditions are calculated to be zero (0) to five (5) Dba L higher than existing traffic noise levels. The traffic noise increase attributable to the proposed project would be less than one Dba L. Noise levels would not be noticeably or measurably increased as a result of the project and therefore are not considered significant."

The draft EIR also includes, at appendix E, a report entitled "Environmental Noise Assessment" and dated December 18, 2008. The report analyzed traffic noise impacts and includes data for the existing noise environment. For example, the report states, "The project site is located northeast of El Camino Real (SR 82) in Sunnyvale, California. The site is currently developed with medical office buildings and parking lots. Commercial land uses border the site to the west, east, and south. Residential land uses along South Sunnyvale Avenue, Carroll Street, South Bayview Avenue, Jarvis Court and Kenn[e]y Court border the site to the north. The existing noise environment in the site vicinity results primarily from traffic on Old San Francisco Road, Carroll Street, South Bayview Avenue, and occasional noise generated by aircraft flying over the site. [¶] A noise monitoring survey was conducted from August 2, 2008 to August 5, 2008 to quantify the existing noise environment at the project site and the project vicinity. The noise monitoring survey included one long-term noise measurements . . . and three short-term measurements. . . ." A chart summarizing the short-term noise measurement data is attached to the report.

Thus, the "Environmental Noise Assessment" report determined that the primary noise source for the project vicinity is vehicle traffic. The report further states, *"Project-generated traffic along roadways in the site vicinity would not substantially increase ambient noise levels at sensitive receivers. This is a less-than-significant impact."* (Italics added.) The report also considered cumulative traffic noise, stating, "Cumulative traffic noise levels are calculated to increase substantially along roadways serving the project site because of cumulative growth forecast in the local General Plan. . . . [¶] The project's contribution to overall cumulative traffic noise increases would be less on other roadways in the site vicinity that carry more traffic. Cumulative plus project traffic noise levels are not anticipated to increase by 5 Dba L or more at sensitive land uses near the project site and the project would not make a 'cumulatively considerable' contribution to the traffic noise level increases anticipated by 2020."

Appellants' conclusory statement in their reply brief that the EIR "simply fails to set forth what the project traffic noise impacts would be on the existing environment" therefore lacks support in the record, since, as indicated in the Environmental Noise Assessment report, existing traffic noise levels were measured and it was determined that project-generated traffic would not substantially increase ambient noise levels.

Moreover, appellants' reliance on the decision in *Sunnyvale West* is again unavailing. In *Sunnyvale West*, this court found that the EIR at issue was inadequate with respect to the proposed project's traffic impacts because the traffic baseline used was "projected traffic conditions in the year 2020." (*Sunnyvale West, supra,* 190 Cal.App.4th at p. 1358.) In accordance with this finding, this court determined that "without an accurate assessment of the traffic impacts of the project alone on the existing environment, it does not make plain whether the project's traffic-related noise impacts on the existing environment would reach the stated thresholds of significance. Nowhere in the [final EIR] is the impact of the project measured against the baseline of the existing ambient noise levels in the project vicinity." (*Id.* at p. 1390.) *Sunnyvale West* is therefore distinguishable from the present case, where the EIR shows that existing traffic noise levels were measured and compared with existing ambient noise levels.

For these reasons, we determine that appellants fail to meet their burden to show that the EIR is legally inadequate with respect to the PAMF project's impact on traffic noise.

F. *Construction Noise*

According to appellants, the EIR is legally inadequate because it failed to analyze mitigation measures or alternatives that would lessen the significant and unavoidable impacts of construction noise to a level of insignificance. They also claim that the EIR is confusing because the EIR summary does not match the EIR text with regard to construction noise impacts.

The City and PAMF assert that since appellants failed to raise the construction noise issue in the trial court they cannot raise it for the first time on appeal. Alternatively, the City and PAMF maintain that the EIR is legally adequate because it contains 11 mitigation measures for construction noise, and there is no duty to analyze mitigation measures or alternatives that would lessen the impact of construction noise to a level of insignificance.

Since the issue of construction noise mitigation measures is mentioned briefly in appellants' memorandum of points and authorities filed in support of their petition for writ of mandate, they may raise the issue on appeal.

However, we are not convinced by their argument that the EIR is inadequate with regard to its discussion of construction noise. Although appellants contend that an EIR must include an analysis of mitigation measures or alternatives that would lessen the impact of construction noise to a level of insignificance, they fail to cite any authority that supports that contention.

 Moreover, the relevant CEQA provisions do not require analysis of mitigation or alternatives that would reduce the impact of construction noise to a level of insignificance. Under CEQA, the EIR must identify a project's significant effects on the environment and describe feasible measures for mitigating significant adverse impacts. (§ 21001.1; Guidelines, § 15126.4, subd. (a)(1).) Section 21002.1 states, "In order to achieve the objectives set forth in Section 21002,[9] the Legislature hereby finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to this division: [¶] (a) The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided. [¶] (b) Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." The CEQA Guidelines further provide, "An EIR shall describe feasible measures which could minimize significant adverse impacts, including where relevant, inefficient and unnecessary consumption of energy." (Guidelines, § 15126.4, subd. (a)(1).)

We believe that the EIR adequately identified the PAMF project's construction noise impacts and described feasible mitigation measures. Although the EIR does mistakenly state, in the section titled "Summary of Impacts and Mitigation Measures," that the "noise generated by construction activities" could be mitigated to "Less than Significant Impact with Mitigation Incorporated," that statement is not likely to create confusion. The EIR clearly states, in detail, that the project's construction noise would result in a significant impact and describes several feasible mitigation measures.

---

[9] Section 21002 provides, "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."

For example, in "Section 2.0—Environmental Setting, Impacts, and Mitigation," the EIR describes the construction-related noise anticipated to occur over a 28-month period. It also provides tables showing "the typical range of hourly average noise levels generated by different phases of construction measured at a distance of 50 feet." Additionally, the EIR specifically identifies construction noise as a significant impact as "Impact NOI-3: The noise generated by construction activities for the proposed project would exceed the City of Sunnyvale's construction noise standards, and would result in significant noise impacts from project construction activities."

The EIR also provides mitigation and avoidance measures for construction noise. In "Section 2.0—Environmental Setting, Impacts, and Mitigation," the EIR identifies 11 measures for the mitigation of construction noise, including: (1) restrict the hours of noise-generating construction activities to 7:00 a.m. to 6:00 p.m. Monday through Friday and 8:00 a.m. to 5:00 p.m. on Saturday; (2) construct 8-foot plywood fences or noise barriers around the construction site; (3) utilize quiet models of air compressors and other stationary noise sources; (4) equip all internal combustion engine-driven equipment with mufflers; (5) locate stationary noise-generating equipment as far away as possible from residences or other noise-sensitive land uses; (6) locate staging areas and construction material areas as far away as possible from residences or other noise-sensitive land uses; (7) route all construction traffic through designated truck routes where possible and prohibit heavy truck traffic in residential areas where feasible; (8) control noise from construction workers' radios so they are inaudible at residences bordering the project site; (9) prohibit unnecessary idling of internal combustion engines; (10) notify all adjacent businesses, residences, and noise-sensitive land uses of the construction schedule in writing; and (11) designate a "disturbance coordinator" who would be responsible for responding to local complaints about construction noise. The EIR's mitigation discussion concludes, "The proposed project, even with the implementation of the above mitigation measures, would result in significant unavoidable short-term construction noise impacts. (**Significant Impact with Mitigation Incorporated.**)"

Having reviewed the EIR, we find the EIR sufficiently presents information regarding construction noise impacts and feasible measures that could minimize significant adverse impacts "in such a manner that the foreseeable impacts of pursing the project can actually be understood and weighed . . . ." (*Vineyard, supra*, 40 Cal.4th at p. 449.) Accordingly, we find no merit in appellants' contention that the EIR is inadequate because it failed to analyze mitigation measures or alternatives that would lessen the significant and unavoidable impacts of construction noise to a level of insignificance.

## IV. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents City of Sunnyvale and Palo Alto Medical Foundation.

Mihara, J., and Lucero, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied February 15, 2012, S198459.

---

*Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.