Filed 10/21/24; Certified for Publication 11/18/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WORKING FAMILIES OF MONTEREY COUNTY et al.,<br><br>   Plaintiffs and Appellants,<br><br>   v.<br><br>KING CITY PLANNING COMMISSION et al.,<br><br>   Defendants and Respondents;<br><br>BEST DEVELOPMENT GROUP, LLC,<br><br>   Real Party in Interest and Respondent. | H051232<br>(Monterey County<br> Super. Ct. No. 22CV001375) |

## I.  INTRODUCTION

This CEQA[1] action arises from the proposal of real party in interest Best Development Group, LLC (Best Development) to develop a Grocery Outlet store in King City.  The King City Planning Commission (Planning Commission) determined that the Grocery Outlet project was subject to the class 32 categorical exemption from the provisions of CEQA for infill development that is provided by California Code of

---

[1] California Environmental Quality Act, Public Resources Code section 21000, et seq.  All further statutory references are to the Public Resources Code unless otherwise indicated.

Regulations, title 14, section 15332, and approved the project.[2] Efrain Aguilera appealed the King City Planning Department's decision to respondent King City Council (City Council), which denied the appeal and approved the Grocery Outlet project as exempt from CEQA pursuant to the class 32 exemption for infill development.

Aguilera and Working Families of Monterey County (collectively, Working Families) challenged City Council's approval of the Grocery Outlet project by filing a petition for writ of mandate contending that the class 32 exemption for infill development did not apply to the project. The trial court denied the petition for writ of mandate.

On appeal, Working Families contends that the class 32 exemption for infill development cannot be applied to the Grocery Outlet project for three reasons: (1) the class 32 exemption provided by CEQA Guidelines, section 15332, must be construed to require an exempt project to be located in an "in-fill site" in an "urbanized area" surrounded by "qualified urban uses" as these terms are defined in sections 21061.3, 21071, and 21072, respectively, and in CEQA Guidelines, section15387; (2) substantial evidence does not support the application of the class 32 exemption because the Grocery Outlet project is located in a rural area and therefore does not qualify as an infill site in an urbanized area surrounded by qualified urban uses; and (3) City Council's environmental assessment failed to adequately analyze the impact on project occupant's air quality from automobile emissions due to the project's location adjacent to Highway 101.

For the reasons stated below, we find no merit in Working Families' contentions and we will affirm the judgment.

---

[2] "The regulations that guide the application of CEQA are set forth in title 14 of the California Code of Regulations, and are often referred to as the CEQA Guidelines. [Citation.]" (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1561, fn. 5; hereafter CEQA Guidelines or Guidelines.)

## II.  FACTUAL BACKGROUND

In April 2021 Best Development filed applications with the King City Community Development Department (Community Development Department) for a conditional use permit, architectural review, monument sign permit, and a landscaping permit for a proposed Grocery Outlet store to be located at 1023 Broadway Street in King City.  The proposed Grocery Outlet store would be a single-story building of approximately 18,187 square feet with 72 parking spaces and approximately 13,908 square feet of landscaping.  The project site of approximately 1.6 acres is located adjacent to Highway 101 and was previously used as a car sales lot.  The surrounding vicinity includes commercial buildings, parking lots, a cemetery, vacant land, and the Monterey County Sheriffs' Department.

In support of its permit applications, Best Development submitted an environmental assessment dated March 3, 2022, to the Community Development Department.  The environmental assessment concluded that the Grocery Outlet project would not result in any potentially significant environmental impacts relating to traffic, noise, air quality, or water quality, or any other environmental factors.  Additionally, the environmental assessment concluded that the Grocery Outlet project qualified for the class 32 categorical exemption for infill development from the provisions of CEQA. (See Guidelines, § 15332.)[3]

---

[3] Guidelines, section 15332 states:  "Class 32 consists of projects characterized as in-fill development meeting the conditions described in this section.  [¶]  (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.  [¶]  (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.  [¶]  (c) The project site has no value, as habitat for endangered, rare or threatened species.  [¶]  (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. [¶]  (e) The site can be adequately served by all required utilities and public services."

The environmental assessment stated that the project qualified for the class 32 exemption for infill development because: "it (i) is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations, (ii) occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses, (iii) has no value as habitat for endangered, rare or threatened species, (iv) would not result in any significant effects relating to traffic, noise, air quality, or water quality, and (v) can be adequately served by all required utilities and public services." The environmental assessment further concluded that there was no basis for an exception to the class 32 exemption. (See Guidelines, § 15300.2 [exceptions to categorical exemptions].)

After holding a public hearing, the Planning Commission adopted Resolution 2022-306 approving Best Development's applications for a conditional use permit, an architectural review permit, a landscaping permit, and a sign design review permit with specified conditions of approval. The Planning Commission also determined that the class 32 exemption for infill development applied to the Grocery Outlet project and directed staff to file a notice of exemption. (See Guidelines, § 15062, subd. (a) [notice of exemption].)

An appeal of the Planning Commission's decision to approve the permit applications and the class 32 exemption for the Grocery Outlet project was submitted to the City Council by Aguilera on behalf of United Food and Commercial Workers Local 5. In his appeal, Aguilera argued, among other things, that the class 32 exemption for infill development was improperly applied to the Grocery Outlet project, and a full environmental review was required to assess the impact of the project site's prior use as a car sales lot, as well as the project's significant impacts on soil quality, traffic, air quality, ground water quality, noise, health, and safety.

After holding a public hearing on the appeal, the City Council found the appeal was without basis and denied the appeal in Resolution 2022-4868. The City Council also

approved the application of the class 32 exemption for infill development to the Grocery Outlet project and approved the conditional use permit, the architectural review permit, the landscaping permit, and the sign design review permit with specified conditions of approval.

### III. PROCEDURAL BACKGROUND

#### A. *Petition for Writ of Mandate*

Working Families filed an amended verified petition for writ of mandate challenging the City Council's denial of Aguilera's appeal from the Planning Commission's adoption of Resolution 2022-306 approving Best Development's applications for a conditional use permit, an architectural review permit, a landscaping permit, and a sign design review permit with the specified conditions of approval, and approving application of the class 32 exemption from the provisions of CEQA to the Grocery Outlet project. The City Council and Planning Commission were named as respondents (hereafter, collectively City) and Best Development was named as real party in interest.

The writ petition included two causes of action alleging violations of CEQA. In the first cause of action, Working Families contended that City had abused its discretion in applying the class 32 exemption for infill development provided by the Guidelines, section 15332, on the Grocery Outlet project. They argued that the class 32 exemption for infill development was inapplicable to the Grocery Outlet project because the project location in King City did not meet the definition of an "urbanized area," as defined in either section 21071, subdivision (a) [population 100,000 or more] or Guidelines, section 15387 [population 50,000 or more] since King City has a population of only 13,332.

Working Families additionally contended that the class 32 exemption did not apply to the Grocery Outlet project because the project site did not meet the definition of an "infill site," as defined in section 21061.3, since the project site was not previously

5

developed for "qualified urban uses." Therefore, Working Families argued, a full environmental review was necessary to study the cumulative environmental impacts of the Grocery Outlet project, including the potential presence of hazardous materials resulting from the operation of the car sales lot.

In the second cause of action for violation of CEQA, Working Families contended that the environmental assessment obtained by City failed to adequately analyze the impact on air quality from the increased traffic resulting from the Grocery Outlet project.

### B. *Opposition to Petition for Writ of Mandate*

In opposition to the petition for writ of mandate, City and Best Development emphasized that the terms "qualified urban use," "urbanized area," and "infill site" are absent from the language of Guidelines, section 15332 stating the requirements for the application of the class 32 infill development exemption. City and Best Development asserted that these terms are found in provisions of the Public Resources Code pertaining to residential projects and in other sections of the CEQA Guidelines. They argued that the omission of these terms from Guidelines, section 15332 showed that the class 32 exemption for an infill development project did not require the project to be a "qualified urban use" located in an "urbanized area" on an "infill site," and therefore these terms could not be read into Guidelines, section 15332.

City and Best Development also argued that substantial evidence showed that City properly found that the Grocery Outlet project site was "substantially surrounded by urban uses," as required by Guidelines, section 15332, subdivision (b). Although they acknowledged that Guidelines, section 15332 does not include a definition of "urban uses," they asserted that City could reasonably determine, as shown by the findings in the environmental assessment, that the property surrounding the Grocery Outlet site was developed with urban uses, including commercial uses, a cemetery, a sheriff's department, and a nearby highway.

6

Finally, City and Best Development contended that substantial evidence supported City's finding that the Grocery Outlet project would not cause any significant effects relating to traffic, noise, air quality, or water quality, or any of the other environmental effects argued by Working Families, as analyzed in the environmental assessment prepared for the project.

## C. *Trial Court Order and Judgment*

In the order dated June 15, 2023, the trial court denied the petition for writ of mandate. The court ruled that: (1) "the Class 32 categorical exemption found in CEQA Guidelines section 15332 does not require a qualifying project to be located on an 'infill site' in an 'urbanized area' as those terms of art are defined in Public Resources Code sections 21061.3 and 21071," (2) "substantial evidence supports the City's determination that the [Grocery Outlet] Project meets the requirements of the Class 32 categorical exemption," (3) "[p]etitioners fail to show that an exception to the exemption applies," and (4) "the City was not required to conduct any formal environmental review for the Project."

In so ruling, the trial court declined to read the terms "infill site" and "urbanized area" into Guidelines, section 15332 because the rules of statutory interpretation prohibit the court from inserting words into a statute. The trial court also found that substantial evidence supported the City's application of the Guidelines, section 15332 exemption for infill developments because the aerial photographs included in the environmental assessment showed that the project site was substantially surrounded by urban uses. Having determined that City appropriately applied the Guidelines, section 15332 exemption to the Grocery Outlet project, the trial court further found that City was not required to conduct any formal environmental review pursuant to CEQA.

The June 15, 2023 order also included a judgment denying the amended petition for writ of mandate and awarding costs to City and Best Development in an amount to be determined.

7

## IV. DISCUSSION

On appeal, Working Families contends that the class 32 exemption for infill development from the provisions of CEQA cannot be applied to the Grocery Outlet project for three reasons: (1) the class 32 exemption provided by CEQA Guidelines, section 15332, must be construed to require an exempt project to be located in an "in-fill site" in an "urbanized area" surrounded by "qualified urban uses" as these terms are defined in sections 21061.3, 21071, and 21072, respectively, and in CEQA Guidelines, section15387; (2) substantial evidence does not support the application of the class 32 exemption because the Grocery Outlet project is located in a rural area and therefore does not qualify as an infill site in an urbanized area surrounded by qualified urban uses; and (3) City's environmental assessment failed to adequately analyze the impact on project occupant's air quality from automobile emissions due to the project's location adjacent to Highway 101.[4]

We will begin our evaluation of Working Families' contentions with an overview of CEQA principles and categorical exemptions.

### A. *Overview of CEQA Principles*

The California Supreme Court has provided an overview of CEQA principles: " 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]'

---

[4] Working Families argues for the first time in its reply brief that the significant noise impacts from the Grocery Outlet project were not adequately analyzed in the environmental assessment. We need not address this issue. "Appellate courts ordinarily will not consider new issues that are raised for the first time in the appellant's reply brief as the respondent has no opportunity to counter such contentions. [Citation.]" (*The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 893.)

[Citation; see Guidelines, § 15002, subd. (f).)  The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.'  (. . . § 21061; see Guidelines, § 15003, subds. (b)-(e).) "  (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511-512, fn. omitted.)

However, "[f]or policy reasons, the Legislature has expressly exempted several categories of projects from review under CEQA.  (See § 21080, subd. (b)(1)-(15).)  By statute, the Legislature has also directed the Secretary of the Natural Resources Agency (Secretary) to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA.  (§ 21084, subd. (a).)"  (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*).)

Thus, "the Legislature, through the Guidelines, intended to enumerate classes of projects that *are* exempt from CEQA because, notwithstanding their *potential* effect on the environment, they already 'have been determined not to have a significant effect on the environment.'  (§ 21084, subd. (a).)  The Guidelines implement this intent, by setting forth the 'classes of projects' that the Secretary, acting '[i]n response to [the Legislature's] mandate,' 'has found . . . do not have a significant effect on the environment.'  (Guidelines, § 15300.)"  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1102.)

Accordingly, if a public agency "determines one of the exemptions applies, the agency may prepare and file a notice of exemption, including a description of the project, a finding that the project is exempt under the relevant class or classes, and a brief statement of reasons supporting the finding.  (Guidelines, § 15062, subd. (a).)  'Where a project is categorically exempt, it is not subject to CEQA requirements and "may be implemented without any CEQA compliance whatsoever." ' [Citation.]"  (*Save Our*

9

*Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 688 (*Save Our Carmel River*).)

**B.** ***Standard of Review***

"In a CEQA case, the appellate court's review 'is the same as the trial court's:  [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.'  [Citation.]" (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)  Where a public agency determines that a project is exempt from compliance with CEQA requirements, that determination is reviewed under the abuse of discretion standard set forth in section 21168.5.[5]  (*Protect Tustin Ranch v. City of Tustin* (2021) 70 Cal.App.5th 951, 960 (*Protect Tustin Ranch*).)  " ' "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." '  [Citation.]" (*Ibid.*)

However, "[w]here the issue turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents 'a question of law, subject to de novo review by this court.'  [Citations.]  Our task is 'to determine whether, as a matter of law, the [project] met the definition of a categorically exempt project.'  [Citation.]  Thus, as to the question whether the activity comes within the categorical class of exemptions, 'we apply a de novo standard of review, not a substantial evidence standard.'  [Citations.]" (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at pp. 693–694.)

---

[5] Section 21168.5 provides:  "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

10

On the other hand, "[w]here the record contains evidence bearing on the question whether the project qualifies for the exemption, such as reports or other information submitted in connection with the project, and the agency makes factual determinations as to whether the project fits within an exemption category, we determine whether the record contains substantial evidence to support the agency's decision. [Citations.] There must be ' "substantial evidence that the [activity is] within the exempt category of projects." [Citation.]' [Citation.] Generally speaking, the court 'may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence within the meaning of Public Resources Code section 21168.5.' [Citation.]" (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 694.)

### C. *Whether the Class 32 Categorical Exemption for Infill Development May Be Applied to the Grocery Outlet Project*

#### 1. Interpretation of Class 32 Exemption

To determine whether the class 32 categorical exemption for infill development may be applied to the Grocery Outlet project, we first consider the language of Guidelines, section 15332.

Guidelines, section 15332 states: "Class 32 consists of projects characterized as *in-fill development* meeting the conditions described in this section. [¶] (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations. [¶] (b) The proposed development occurs within city limits on a project site of no more than five acres *substantially surrounded by urban uses*. [¶] (c) The project site has no value, as habitat for endangered, rare or threatened species. [¶] (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. [¶] (e) The site can be adequately served by all required utilities and public services." (Emphasis added.)

11

The parties disagree regarding the proper interpretation of Guidelines, section 15332 with respect to the terms "infill development" and "substantially surrounded by urban uses." Working Families contends that when Guidelines, section 15332 is properly interpreted, the Grocery Outlet project does not qualify for the class 32 exemption for infill development. According to Working Families, because Guidelines, section 15332 does not define the terms "in-fill development" or "substantially surrounded by urban uses," those terms must be interpreted by the CEQA definitions of "in-fill site," "urbanized area," and "qualified urban uses," as provided by sections 21061.3, 21071, and 21072, respectively, and CEQA Guidelines, section 15387.

Sections 21061.3, 21071, and 21072 are included in the list of definitions provided by CEQA at section 21060 et seq.[6] Section 21061.3 defines " '[i]nfill site' " as "a site in an urbanized area" that meets the specified criteria. Section 21071 defines " '[u]rbanized area' " as either an incorporated city or two contiguous incorporated cities with a population "of at least 100,000 persons." Section 21072 defines " '[q]ualified urban uses' " as "any residential, commercial, public institutional, transit or transportation passenger facility, or retail use, or any combination of those uses." CEQA Guidelines, section 15387 provides in part that " '[u]rbanized area' means a central city or a group of contiguous cities with a population of 50,000 or more, together with adjacent densely populated areas having a population density of at least 1,000 persons per square mile."

Working Families argues that due to King City's small rural population, the Grocery Outlet project site in King City is not located in an " '[u]rbanized area' " as defined in section 21071 or Guidelines, section 15387. Further, since the Grocery Outlet project is not located in an "urbanized area," Working Families maintains that the project site does not meet the definition of "infill site." Applying these definitions to interpret Guidelines, section 15332, Working Families argues, shows that the Guidelines,

---

[6] Section 21060 states: "Unless the context otherwise requires, the definitions in this chapter govern the construction of this division."

12

section 15332 exemption for infill development cannot apply to the Grocery Outlet project.

City and Best Development respond that there is no authority for the proposition that the CEQA definitions of "infill site," "urbanized area," and "qualified urban uses," as provided by sections 21061.3, 21071, and 21072, respectively, and CEQA Guidelines, section 15387, should be utilized in interpreting the Guidelines, section 15332 exemption for infill development, and the rules of statutory interpretation compel a contrary result.[7] As we will discuss, we agree.

"Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations. [Citations.]" (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1097.) " ' "We give the regulatory language its plain, commonsense meaning. If possible, we must accord meaning to every word and phrase in a regulation, and we must read regulations as a whole so that all of the parts are given effect. [Citation.] If the regulatory language is clear and unambiguous, our task is at an end, and there is no need to resort to canons of construction and extrinsic aids to interpretation. [Citation.]" [Citation.] Our primary aim is to ascertain the intent of the administrative agency that issued the regulation. [Citation.] When that intent "cannot be discerned directly from the language of the regulation, we may look to a variety of extrinsic aids, including the purpose of the regulation, the legislative history, public policy, and the regulatory scheme of which the regulation is a part." ' [Citation.]" (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 890–891 (*Berkeley Hills*).)

---

[7] The request for judicial notice filed by City and Best Development is granted as to Exhibit A (Sen. Bill No. 1925 (2001–2002 Reg. Sess.) ch. 1039) and Exhibit B (Sen. Bill No. 1108 (2005–2006 Reg. Sess.) ch. 22) and denied as to Exhibit C (excerpt of treatise). (Evid. Code, § 452, subd. (c).)

Additionally, this court has noted that "[s]ince a determination that a project falls within a categorical exemption excuses any further compliance with CEQA whatsoever, we must construe the exemptions narrowly in order to afford the fullest possible environmental protection.  [Citations.]  '[E]xemption categories are not to be expanded or broadened beyond the reasonable scope of their statutory language.'  [Citations.]"  (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 697.)

Here, the question before us is the meaning of the terms "in-fill development" (Guidelines, § 15332) and "substantially surrounded by urban uses" (Guidelines, § 15332, subd. (b).  To the extent these terms in Guidelines, section 15332 may be considered ambiguous, we first turn to the intent of the Natural Resources Agency in issuing Guidelines, section 15332.  (See *Berkeley Hills*, *supra*, 31 Cal.App.5th at pp. 890–891.)  During the review period for Guidelines, section 15332 (originally numbered 15333), the Natural Resources Agency provided an initial statement of reasons for a regulation exempting infill development, which stated the public problem to be addressed by the regulation:  "Widely dispersed development, or 'sprawl,' though it contributed to the economic and population boom in California in the past 50 years, now stands as a force to degrade the quality of life for residents of the state.  Reduction of sprawl and its costs is a policy that needs attention in CEQA."[8] (Natural Resources Agency, <https://web.archive.org/web/20001002144443/http:/ceres.ca.gov/topic/env_law/ceqa/rev/9798rev/9798isor.html> [as of October 21, 2024], archived at:  <https://perma.cc/K723-KJYV>.)

---

[8] On our own motion, we take judicial notice of the initial statement of reasons pertaining to Guidelines, section 15332 as part of the official statement of regulatory intent.  (Evid. Code, § 452, subds. (b),(c); see *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 186, fn. 15.)

Regarding the necessity for a regulation exempting infill development, the initial statement of reasons further stated: "As noted above, though sprawl is partly responsible for the rise of the California economy, it now poses a threat to our quality of life. The permanent loss of farmland, increased use of automobiles for commuting, and degradation of central city neighborhoods are just some of the costs associated with sprawl. [¶] This categorical exemption will implement a finding that development which meets specific requirements and which is 'in-fill' or development in areas already developed, does not pose a significant effect on the environment." (Natural Resources Agency, <https://web.archive.org/web/20001002144443/http:/ceres.ca.gov/topic/env_law/ceqa/rev/9798rev/9798isor.html> [as of October 21, 2024], archived at: <https://perma.cc/YCU6-MQBA>.)

In addition, the Governor's Office of Planning and Research provides a definition of "infill development" on its website, as follows: "The term 'infill development' refers to building within unused and underutilized lands within existing development patterns, typically but not exclusively in urban areas. Infill development is critical to accommodating growth and redesigning our cities to be environmentally- and socially-sustainable." (Governor's Office of Planning and Research, <https://opr.ca.gov/planning/land-use/infill-development/> [as of October 21, 2024], archived at: <https://perma.cc/Z7UQ-KEWA>;[9] see also *United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, 1080, fn. 2 [" 'Infill' refers,

---

[9] On our own motion, we take judicial notice of the statement of the Office of Planning and Research regarding infill development as part of the official statement of regulatory intent. (Evid. Code, § 452, subds. (b),(c); section 21083, subd (a) ["The Office of Planning and Research shall prepare and develop proposed guidelines for the implementation of this division by public agencies. The guidelines shall include objectives and criteria for the orderly evaluation of projects and the preparation of environmental impact reports and negative declarations in a manner consistent with this division."].)

both colloquially and for purposes of the Guidelines, to construction in areas that are already largely developed.  (Guidelines, § 15332, subd. (b) . . . ; [citations.]”.)

Our review of the statements of regulatory intent shows no indication that the regulators intended to limit the Guidelines,section 15332 categorical exemption for infill development to projects that meet the criteria set forth in the CEQA definitions of “infill site,” “urbanized area,” and “qualified urban uses,” as provided by sections 21061.3, 21071, and 21072, respectively, and CEQA Guidelines, section 15387.  Not only are those terms absent from the language of Guidelines, section 15332, the stated regulatory intent lacks any indication of a population requirement such as section 21071’s definition of an “ ‘[u]rbanized area’ ” as a city population “of at least 100,000 persons” (*id.*, subd. (a)(1))or Guidelines, section 15387’s definition of an “ ‘[u]rbanized area’ ” as a city or cities with a population of 50,000 or more.  The regulators’ intent was to the contrary, since the express intention was to reduce sprawl by exempting from the provisions of CEQA development in unused or underutilized areas that were in already developed areas, which were “typically but not exclusively in urban areas.”  (Governor’s Office of Planning and Research, <https://opr.ca.gov/planning/land-use/infill-development/> [as of October 21, 2024], archived at:  <https://perma.cc/6XQS-82EY>.)

Other rules of statutory interpretation also do not support Working Families’ interpretation of Guidelines, section 15332.  The omission of the terms “infill site,” “urbanized area,” and “qualified urban uses,” from the language of Guidelines, section 15332 is significant because the California Supreme Court has instructed that a court “may not broaden or narrow the scope of the provision by reading into it language that does not appear in it or reading out of it language that does.”  (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545.)  We therefore find no merit in Working Families’ contention that the lack of definitions for the terms “in-fill development” and “surrounded by urban uses” in Guidelines, section 15332 means that those terms should be interpreted by inserting the statutory definitions of “in-fill site,” “urbanized area,” and

16

"qualified urban uses," as provided by sections 21061.3, 21071, and 21072, respectively, and CEQA Guidelines, section 15387.

Further, "[i]t is a fundamental principle of statutory construction that '[w]here different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning. [Citation.]' [Citation.]" (*Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 936 (*Branciforte*).) Applying that rule to the CEQA Guidelines, we note that although Guidelines, section 15387 includes a definition of " '[u]rbanized area,' " as "a central city or a group of contiguous cities with a population of 50,000 or more, together with adjacent densely populated areas having a population density of at least 1,000 persons per square mile," the term "urbanized area" was not included in the language of Guidelines, section 15332. We therefore determine that the phrase "surrounded by urban uses" in Guidelines, section 15332, subdivision (b) cannot be construed to mean an "urbanized area" as defined by Guidelines, section 15387, since we must presume that the regulators intended a different meaning by using different phrases. (See *Branciforte*, *supra*, at p. 936.)

Finally, we are mindful of "the Legislature's express directive in section 21083.1 'not [to] interpret' the CEQA statutes *and the Guidelines* 'in a manner which imposes procedural or substantive requirements beyond those' the statutes *and the Guidelines* 'explicitly state[].' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1108.) To adopt Working Families' interpretation of Guidelines, section 15332 would require "environmental review of projects that one could argue *may* have a significant environmental effect, but that the [Governor's Office of Planning and Research] and the Secretary [of the Natural Resources Agency], exercising the authority the Legislature has by statute delegated to them and required them to exercise, *have already determined do not, in fact,* 'have a significant effect on the environment.' (§ 21084, subd. (a).)" (*Berkeley Hillside*, *supra*, at p. 1108.)

For these reasons, we find no merit in Working Families' contention that Guidelines, section 15332 should be interpreted by applying statutory definitions of "in-fill site," "urbanized area," and "qualified urban uses," as provided by sections 21061.3, 21071, and 21072, respectively, and CEQA Guidelines, section 15387.[10] We therefore determine that City did not err in determining that the Grocery Outlet project comes within the Guidelines, section 15332 exemption for infill development.

## 2. Application of Guidelines, Section 15332 Exemption

Working Families further contends that the Guidelines, section 15332 exemption should not apply to the Grocery Outlet project because the environmental assessment obtained by Best Development failed to adequately analyze the "human health impacts to Project users resulting from air quality impacts caused by the Project and that may be cumulatively exacerbated by the Project and Interstate 101." According to City and Best Development, since the class 32 exemption for infill development applies, compliance with CEQA's requirements for an adequate environmental impact report is not necessary.

---

[10] At oral argument, counsel for Working Families emphasized a decision not included in their briefing, *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 270-271 (*Banker's Hill*), which determined that the phrase "urban uses" in CEQA Guidelines, section 15332 should be defined under the Community Redevelopment Law, Health and Safety Code section 33000 et seq. as " 'related to or characteristic of a city or a densely populated area.' " The *Banker's Hill* decision relied on the decision in *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 538 (*Mammoth Lakes*), which concerned the issue of whether a redevelopment plan was properly approved because it did not satisfy the requirement of being located in a " 'predominantly urbanized' " area under Health and Safety Code section 33030, subdivision (b)(1). We find Working Families' reliance on these decisions misplaced, since the decision in *Mammoth Lakes* did not construe Guidelines, section 15332. Also, since we have construed the terms "in-fill development" (Guidelines, § 15332) and "substantially surrounded by urban uses" (Guidelines, § 15332, subd. (b)) in accordance with the intent of the administrative agency that issued Guidelines, section 15332, we need not resort to the definitions found in the Health and Safety Code.

18

We need not address Working Families' contention regarding the adequacy of the environmental assessment with respect to the impact of Grocery Outlet on air quality. As we have noted, " '[w]here a project is categorically exempt, it is not subject to CEQA requirements and "may be implemented without any CEQA compliance whatsoever." ' [Citation.]" (*Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 688.) Working Families' contention that the analysis of air quality impacts is inadequate relies upon decisions that considered the adequacy of environmental impact reports that were required under CEQA, and therefore those decisions have no application in the present case. (See, e.g., *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 388; *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 287.)

Alternatively, Working Families contends that there is not substantial evidence in the record to support City's finding that the class 32 exemption applies to the Grocery Outlet project because King City is not in an "urbanized area," the project is not surrounded by "qualified urban uses," and the project site is not an "in-fill site." City and Best Development respond that the environmental assessment prepared for the Grocery Outlet contains substantial evidence that the project site is surrounded by urban uses, based on the description of the surrounding area and aerial photographs depicting the project site.

We apply the following standard of review: " '[W]here[, as here,] a public agency makes a factual determination that a project falls within a . . . categorical exemption, we apply the substantial evidence standard in reviewing the agency's finding.' [Citation.] We do not weigh conflicting evidence, as that is the role of the public agency. [Citation.] Rather, we review the administrative record to see if it contains evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value, to support the agency's decision. [Citation.]" (*Protect Tustin Ranch*, *supra*, 70 Cal.App.5th at p. 960.)

Here, the environmental assessment prepared for the Grocery Outlet project includes a description of the area surrounding the project location that states the location is "within 1,000 feet north of U.S. Highway 101" and "[s]urrounding land uses include commercial to the northeast and southwest, a cemetery to the northwest, and vacant land and the Monterey County Sheriff's Department to the southeast. The project site has a General Plan land use designation of HSC, Highway Service Commercial, with a zoning designation of H-S, Highway Service District." The environmental assessment also includes two aerial photographs showing the project location and the surrounding areas.

Having reviewed the relevant portions of the environmental assessment, we determine that substantial evidence supports City's finding that the location of the Grocery Outlet project is substantially surrounded by urban uses, as required by Guidelines, section 15332, subdivision (b) for application of the class 32 infill development exemption. In particular, the aerial photographs show that the project location is surrounded on two sides by commercial buildings, on a third side by the Monterey County Sheriff's Department buildings adjoining a vacant lot, and on the fourth side by the King City Cemetery. The photographs also show that the project location is adjacent to Highway 101.

We therefore find no merit in Working Families' contentions that the class 32 exemption for infill development provided by Guidelines, section 15332 does not apply to exempt the Grocery Outlet project from the provisions of CEQA and an environmental impact report must be prepared for the project. Having reached this conclusion, we will affirm the judgment.

## V. DISPOSITION

The June 15, 2023 judgment is affirmed. Costs on appeal are awarded to respondents King City Planning Commission and King City Council and respondent Best Development Group, LLC.

20

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
WILSON, J.

***Working Families of Monterey County et al. v. King City Planning Commission et al.***
**H051232**

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| WORKING FAMILIES OF MONTEREY COUNTY et al., | H051232 (Monterey County Super. Ct. No. 22CV001375) |
|     Plaintiffs and Appellants, | |
|     v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| KING CITY PLANNING COMMISSION et al., | |
|     Defendants and Respondents; | |
| BEST DEVELOPMENT GROUP, LLC, | |
|     Real Party in Interest and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on October 21, 2024, was not certified for publication in the Official Reports. The Rural County Representatives of California and the California State Association of Counties request that the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

_____

BAMATTRE-MANOUKIAN, J.

_____

GREENWOOD, P.J.

_____

WILSON, J.

*Working Families of Monterey County et al. v. King City Planning Commission et al.*
**H051232**

Trial Court:                                    Monterey County Superior Court
                                                Superior Court No.:  22CV001375


Trial Judge:                                    Hon. Carrie McIntyre Panetta


Attorneys for Plaintiffs and Appellants:        Tal Clifton Finney
Working Families of Monterey County             Shaune Brockton Arnold
Efrain Aguilera                                 Finney Arnold, LLP


Attorneys for Defendants and Respondents:       Roy C. Santos, City Attorney
King City Planning Commission                   Shannon L. Chaffin, Assistant City Attorney
King City Council                               Aleshire & Wynder, LLP


Attorney for Real Party in Interest:            James G. Moose
Best Development Group, LLC                      Christina Lee Berglund
                                                Remy, Moose, Manley, LLP


*Working Families of Monterey County et al. v. King City Planning Commission et al.*
**H051232**